Compañía Azucarera del Toa, apelante, *v.* La Comisión de Servicio Público de Puerto Rico, apelada.

Núm. 9934. *Sometido:* Enero 10, 1950. *Resuelto:* Abril 13, 1950.

*Gabriel de la Haba, Damián Monserrat, Jr.,* y *Rafael Baragaño, Jr.,* abogados de la apelante; *Hon. Procurador General Vicente Géigel Polanco* y *A. Torres Braschi, Procurador General Auxiliar,* abogados de la apelada; *José G. González y E. T. Sifre, Jr.,* como *amici curiae.*

EL JUEZ ASOCIADO SEÑOR SNYDER emitió la opinión del tribunal.

El presente es un recurso de apelación interpuesto por la Compañía Azucarera del Toa contra sentencia del Tribunal de Distrito de San Juan confirmando dos resoluciones de la Comisión de Servicio Público fijando tarifas provisionales a ser cobradas por la compañía durante la zafra de 1944–45 por moler las cañas de sus colonos. [1]

El primer error señalado es que la corte inferior "cometió error al resolver que la Comisión de Servicio Público de Puerto Rico se había ajustado estrictamente a la letra de la Ley núm. 12 de 9 de abril de 1941 al fijar la Tarifa Provisional para la apelante por el año 1944–45, y que actuó correctamente al fijar como base tarifaria únicamente el costo original menos depreciación; y al resolver que en la determinación de una Tarifa Provisional la Comisión no estaba obligada a considerar ningún otro elemento de valoración y no tenía que dar peso o valor alguno a otros factores tales como costo de reproducción, capital de explotación, capital invertido en materiales en almacén y valor de la empresa como negocio en marcha, porque esto sólo es requerido cuando se trata de fijación de Tarifas Permanentes."

■ Examinemos primeramente sobre qué base la Comisión está autorizada para fijar tarifas provisionales a las compañías azucareras. A tenor con el artículo 12 de la Ley núm. 221, Leyes de Puerto Rico, 1942 ((1) pág. 1177), las compañías que se dedican a la elaboración y refinación de azúcar son declaradas empresas de servicio público. Véase *Pueblo* v. *A. Roig, Sucrs.*, 63 D.P.R. 18, confirmado en 147 F.2d 87 (C.C.A. 1, 1945). En virtud del artículo 13(*a*) y de varios otros, la Comisión está facultada para fijar las tarifas que las compañías pueden cobrarles a sus colonos por molerles sus cañas.

---

[1] Los casos de *South Porto Rico Sugar Co.* v. *Comisión de Servicio Público*, núm. 10053, y *A. Roig Sucrs. S. en C.* v. *Comisión de Servicio Público*, núm. 10054, en los cuales la Comisión fijó tarifas provisionales para la zafra 1945–1946, están siendo resueltos hoy por los fundamentos de esta opinión.

 En la exposición de motivos de la Ley núm. 221, la Legislatura enumeró diecisiete "conclusiones". La décimoséptima es que las centrales azucareras "deben estar garantizadas de ganar un provento razonable sobre su capital real y útilmente invertido." Y el artículo 17(f) ordena a la Comisión que "determine el porciento anual que deba percibir como beneficio razonable cada compañía azucarera sobre su capital invertido." Para que la Comisión pueda determinar qué constituye el "capital invertido" sobre el cual las centrales recibirían un beneficio razonable, la Legislatura dispuso en el artículo 33 lo siguiente: ·

"La Comisión tendrá poder, a solicitud o de oficio, para establecer y determinar el justo valor de la propiedad de toda compañía azucarera en Puerto Rico, y para determinar cualquier asunto relacionado con tal valor; y ejercerá dicho poder siempre que se le requiera el ejercicio del mismo, o siempre que considerare tal valoración o determinación necesaria o conveniente en virtud de cualquiera de las disposiciones de esta Ley.

"(a) Al establecer y determinar dicho justo valor, la Comisión podrá determinar todo hecho, asunto o cosa que, a su juicio, tenga o pueda tener relación alguna con dicho valor; y podrá tomar en consideración el costo original de construcción, particularmente en lo que se refiere a la cantidad invertida en las mejoras existentes, permanentes y útiles, al desarrollo histórico de la compañía azucarera en cuestión, el importe de sus bonos y acciones de acuerdo con su valor en el mercado, la probable capacidad productiva de la propiedad de acuerdo con los tipos, precios, compensación, normas y condiciones determinados que se prescribieran por estatuto u ordenanza, reglamentos o reglas, o que se fijaren o propusieren por la Comisión, y las partidas de gastos por equipo y construcción anticuados; el costo de producción de la propiedad basado sobre el justo precio promedial de los materiales, propiedad y mano de obra, y el valor de desarrollo y valor comercial (development and going concern value) de tal compañía azucarera y a éstos, y a cualesquiera otros elementos de valor les será dado por la Comisión la consideración que fuere justa y propia en cada caso."

En el caso de *Smyth v. Ames*, 169 U. S. 466, la corte resolvió que la cláusula del debido procedimiento exigía que la tarifa fijada por una Comisión de Servicio Público por servicios prestados al público por una empresa de servicio público, deben producir un beneficio justo a la empresa sobre el justo valor de la propiedad dedicada a dicho servicio. También resolvió la corte que al determinar el justo valor de la propiedad, deben tomarse en cuenta ciertos factores de valor. El artículo 33 (*a*) es esencialmente una reexposición de estos factores.

Es innecesario que nos detengamos a considerar el argumento de que el caso de *Smyth* v. *Ames* ya no representa buen derecho constitucional y que por consiguiente la Legislatura puede ahora, de así elegirlo, válidamente disponer que la Comisión puede fijar las tarifas que tanto las empresas de servicio público tradicionales como las compañías azucareras pueden cobrar, sin tomar en consideración todos los elementos de valor contenidos en *Smyth* v. *Ames* y en el artículo 33 (*a*). *Cf. Power Comm'n* v. *Pipeline Co.*, 315 U. S. 575; *Power Comm'n* v. *Hope Gas Co.*, 320 U. S. 591; *Market Street R. Co.* v. *Comm'n*, 324 U. S. 548. [2] Tampoco tenemos que ver con el hecho de que las cortes hayan sostenido el poder de la Legislatura para fijar los precios que las centrales azucareras pueden cobrar a sus colonos por moler las cañas de éstos, independientemente de los referidos factores de valor. *Vidal* v. *Fernández*, 104 F.2d 606 (C.C.A. 1, 1939), *certiorari* denegado, 308 U. S. 602; véase *Secretary of Agriculture* v. *Central Roig Refining Company et al.*, 338 U. S. 604, resuelto el

---

[2] Véanse *Wilson* v. *Brown*, 137 F.2d 348, 351 (Emerg. Ct. Apps., 1943); Freeman, *An "Enlightened Judgment" Approach to Rate of Return*, 61 Harv. L. Rev. 1380; Hale, *Utility Regulation in the Light of The Hope Natural Gas Case*, 44 Col. L. Rev. 488; Bauer, *The Establishment and Administration of a "Prudent Investment" Rate Base*, 53 Yale L.J. 495; Burt and Highsaw, *Developmental Costs under the Prudent Investment Theory*, 94 U. Pa. L. Rev. 1; Yale L.J. 1027; Rottschaefer, *The Constitution and Socio-Economic Change*, págs. 162–169; Rottschaefer, *Cases on Constitutional Law*, ed. 1948, pág. 566, Note.

6 de febrero de 1950. La Legislatura optó (1) por disponer en la Ley núm. 221 que las compañías azucareras serán empresas de servicio público y (2) por exigir a la Comisión de acuerdo con el artículo 33(a) de la Ley núm. 221 que considerara todos los elementos de valor contenidos en dicho artículo al determinar el valor de la propiedad de las centrales azucareras a los fines de fijar tarifas.[3] Mientras el artículo 33(a) permanezca en nuestras leyes, es por tanto el deber de la Comisión considerar todos estos elementos de valor al determinar una base tarifaria para poder fijar una tarifa permanente.

Sin embargo, la experiencia obtenida durante muchos años en un número de estados ha demostrado que el fijar tarifas *permanentes* para empresas clásicas de servicio público de conformidad con la fórmula del caso de *Smyth* v. *Ames*, constituía un proceso extenso y complicado. En virtud de esta experiencia, el estado de Nueva York empleó el método de establecer tarifas provisionales sin tomar en consideración todos los elementos de valor establecidos en *Smyth* v. *Ames*. Esto fué rechazado por la Corte Suprema por infringir la cláusula del debido procedimiento de ley. *Prendergast* v. *N. Y. Tel. Co.*, 262 U. S. 43. Pero Nueva York trató de nuevo. Esta vez aprobó un estatuto autorizando la fijación de una tarifa provisional, que regiría hasta que se fijara la tarifa permanente y que proporcionaría un ingreso no menor del 5 por ciento sobre el costo original depreciado. Para salvar la constitucionalidad de esta nueva ley, la Comisión fué "autorizada" a considerar el efecto de la tarifa pro-

---

[3] La Comisión no alega que el artículo 33(a) sea meramente permisivo y no mandatorio. Creemos que ha actuado correctamente al no insistir en semejante argumento. Toda vez que el artículo 33(a) fué aprobado cuando *Smyth* v. *Ames* era aún la ley, obviamente la intención legislativa cuando aprobó el artículo 33(a) fué darle carácter mandatorio, para evitar serias dificultades constitucionales que se pensó existían en esa época. Véase *Bronx Gas & Electric Co.* v. *Maltbie*, 3 N.E.2d 512 (N. Y., 1936).

visional al fijar la tarifa permanente. Artículo 114 de la Ley de Servicio Público, Leyes Consolidadas, cap. 48.

En un caso en que se impugnaba una tarifa provisional fijada en esta forma, la Corte de Apelaciones de Nueva York sostuvo este estatuto. Resolvió en *Bronx Gas & Electric Co.* v. *Maltbie*, 3 N.E.2d 512, que el estatuto fué aprobado (pág. 515) "para contrarrestar la censura del caso de *Prendergast* y seguir la norma implícitamente señalada para una ley adecuada." Describía dicho caso la forma en que operaba el estatuto, como sigue (pág. 515) :

> *"La Comisión fija una tarifa provisional mientras se celebra la vista.* Se basa en los elementos expuestos, que no son todos aquellos requeridos para fijar una tarifa permanente. Como ya se ha indicado, esto sería imposible, si tenemos que considerar al fijar una tarifa provisional todos los elementos exigidos para la tarifa definitiva : jamás se podría fijar una tarifa provisional. Esto también es evidente. Por tanto, para cumplir con estos requisitos, la tarifa provisional se fija, dentro de límites razonables, sobre números o partidas que con alguna certeza pueden obtenerse de los libros de la compañía, demostrativos del costo original o de las inversiones; *y si finalmente, al terminarse el procedimiento, se prueba que la tarifa provisional ha sido muy baja,* se permitirá y autorizará a la empresa que cobre lo suficiente por el servicio prestado para resarcirse de la pérdida. El consumidor pagará lo que debió pagar, y la única forma de conseguir esto es fijar una tarifa lo suficientemente alta para enjugar esta pérdida." (Bastardillas nuestras.)

La corte de Nueva York creyó que el estatuto era constitucional no obstante lo resuelto en el caso de *Prendergast* y en el de *Smyth* v. *Ames*, porque (pág. 516) "la comisión está autorizada, en verdad está *compelida*, a enjugar esta pérdida, si la hubiere [resultante de la tarifa provisional] a través de la tarifa permanente . . . Este artículo, como hemos visto, *obliga* a la Comisión de Servicio Público a considerar los ingresos de la tarifa provisional y a establecer la tarifa permanente, o la definitiva, de conformidad con ello; es decir, si la tarifa provisional ha demostrado ser muy baja, la tarifa permanente debe devolver la pérdida a la compañía. Sobre

el tiempo necesario para proveer una tarifa suficiente que enjugue la pérdida, o incluya lo cobrado, es cuestión de ajuste, de mecánica, y de método . . ." (Corchetes y bastardillas nuestros).

El resultado es que el caso de *Maltbie* sostiene la constitucionalidad de un estatuto que autoriza la fijación de una tarifa provisional que produce un 5 por ciento del costo original depreciado de los bienes de una empresa clásica de servicio público, aun bajo los casos anteriores que resolvían que la cláusula del debido procedimiento exige que todos los otros elementos de valor contenidos en *Smyth* v. *Ames* se tomen en consideración al establecer una tarifa permanente. Pero es obvio que el estatuto de Nueva York no autoriza la fijación de una tarifa provisional en un vacío. Al contrario, la autoridad de la Comisión para fijar una tarifa provisional prescindiendo de los otros factores de valor está predicada en que se hallaba pendiente un procedimiento para fijar una tarifa permanente. En adición a las claras afirmaciones a ese efecto contenidas en el caso de *Maltbie*, la Corte de Apelaciones de Nueva York recientemente reiteró este requisito en *Consolidated Edison Co. of New York* v. *Maltbie*, 90 N.E.2d 35 (N. Y., 1949) a la pág. 37: "La limitación de tiempo implícita en el estatuto es que las tarifas provisionales *sólo pueden imponerse después de haberse dado comienzo a un procedimiento sobre fijación de una tarifa permanente y antes de su determinación final.*" (Bastardillas nuestras.)

Nuestra Legislatura siguió la pauta de Nueva York. También se dió cuenta de que si se seguía la fórmula contenida en *Smyth* v. *Ames* al valorar propiedad como base tarifaria para la fijación de una tarifa permanente a ser cobrada por empresas clásicas de servicio público, los procedimientos se dilatarían indebidamente. En consecuencia, aprobó la Ley núm. 12, Leyes de Puerto Rico, 1941 ((1) pág. 343), que adicionó el artículo 24 (*a*) a nuestra Ley de Servicio Público, Ley núm. 70, Leyes de Puerto Rico, 1917, Vol. II

(pág. 433).(⁴) De una comparación del artículo 24 (a) y del estatuto de Nueva York, surge evidente que la Comisión y la corte inferior actuaron correctamente al resolver que, para nuestros fines, el artículo 24 (a) es idéntico al estatuto de Nueva York.

Como ya se ha indicado, en 1942 la Legislatura declaró a las compañías azucareras empresas de servicio público. Y al así hacerlo, optó mediante el artículo 33 (a) de la Ley núm. 221, por exigirle a la Comisión que les fijara las tarifas permanentes sobre una base tarifaria que debe ser determinada a tenor con la fórmula del caso de *Smyth* v. *Ames*. Pero se dió cuenta de que, al igual que en el caso de empresas clásicas

---

(⁴) El artículo 24 (a) lee como sigue:

"A los fines de conseguir la mayor rapidez posible en la tramitación de todos los casos en que la comisión tuviere que determinar la razonabilidad de las tarifas de cualquier empresa de servicio público la comisión podrá requerir de cualquier compañía de servicio público que haga, y conserve en todo tiempo correcto, un inventario detallado, permanente (*continuing property record*), de todas las propiedades físicas utilizadas en el servicio público por ella prestado, y podrá requerir, además, que dicha compañía de servicio público lleve sus libros, cuentas y récords en forma tal que demuestren en todo tiempo el costo original de dichas propiedades físicas así como las reservas que hubiere acumulado para el pago del retiro o reemplazo de las mismas.

"*En cualquier procedimiento incoado para determinar la razonabilidad de las tarifas de cualquier empresa de servicio público la comisión podrá*, previa notificación y audiencia, en los casos en que, en su opinión, fuere requerido en provecho público, fijar, determinar y *prescribir tarifas provisionales que serán puestas en vigor por la compañía de servicio público que estuviere implicada, durante el tiempo que se requiriese para la determinación de las tarifas que deben, en definitiva regir.*

"Las tarifas provisionales así determinadas y prescritas se basarán en la necesidad de proveer un rédito no menor de un cinco (5) por ciento del costo original, menos depreciación acaecida, de las propiedades físicas utilizadas en el servicio de la compañía de servicio público implicada en el caso. Si los informes debidamente certificados por dicha compañía no contuvieran el costo original menos depreciación de las referidas propiedades, la comisión podrá estimar dicho costo y depreciación y fijar, determinar y prescribir las tarifas en la forma en que aquí se dispone.

"*Las tarifas temporarias así determinadas y prescritas estarán en vigor hasta que empiecen a regir las que en definitiva se fijaren y prescribieren como razonables.* Al determinar las tarifas razonables definitivas que se deben poner en vigor por tiempo indefinido la comisión podrá tomar en consideración el efecto de carácter económico que puedan producir las prescritas para vigencia temporánea." (Bastardillas nuestras.)

de servicio público, ése sería un procedimiento muy largo. Por consiguiente, dispuso en el artículo 68 de la Ley núm. 221 que "serán asimismo aplicables a las compañías azucareras las disposiciones de la Ley núm. 12 aprobada en 9 de abril de 1941." Con esto quedó la Comisión autorizada para fijar tarifas provisionales a ser cobradas por las compañías azucareras de acuerdo con el artículo 24 (a).

▮▮▮ Hecho el anterior historial, pasemos ahora a los hechos del presente caso. Aquí la Comisión fijó lo que llamó una tarifa provisional que la Compañía Azucarera del Toa podía cobrar a sus colonos por molerles sus cañas durante la zafra de 1944-45. ([5]). Se concede que la Comisión no tomó en consideración los varios elementos de valor provistos en el artículo 33 (a). Por el contrario, sus órdenes expresamente dicen que fijó la alegada tarifa provisional solamente a base de un 5 por ciento del costo original de la propiedad menos depreciación, según lo dispone el artículo 24 (a). La validez de la tarifa provisional debe por consiguiente prevalecer o caer, según admite la Comisión, con la proposición de si ésta tenía autoridad para actuar de conformidad con los términos del artículo 24 (a).

Ya hemos visto que el estatuto de Nueva York del cual se copió el artículo 24 (a) específicamente provee, y así lo resuelven los casos de Nueva York, que una tarifa provisional puede ser fijada solamente si está pendiente un procedimiento para fijar una tarifa permanente. . La razón para esto es obvia. La tarifa provisional es solamente un compás de espera temporal. Debido a que el estatuto—y anteriormente y quizás aun la constitución—exige una fórmula diferente para determinar el valor de la propiedad de la empresa, la tarifa provisional debe ser sustituída lo más pronto posible por una tarifa permanente, que será suficientemente alta para reembolsarle a la compañía las pérdidas sufridas, de haberlas, bajo la tarifa provisional. Proveer que una tarifa provisio-

---

([5]) Tarifas provisionales similares fueron fijadas para las zafras 1942-43 y 1943-44.

nal podría ser fijada aun cuando no estuviera pendiente un procedimiento para fijar la tarifa permanente, levantaría una sustancial cuestión constitucional. Véase *Prendergast v. N. Y. Tel. Co.*, supra. Además, sería contrario al propósito mismo del estatuto: fijar una tarifa provisional durante el largo período exigido para, el procedimiento de fijar una tarifa permanente.

El presente caso es un vivo ejemplo de lo que la Legislatura tuvo en mente. Los autos demuestran que no se ha iniciado procedimiento alguno para fijar la tarifa permanente para esta compañía y que no se han celebrado vistas a tal fin. Sin embargo, so pretexto de fijar una "tarifa provisional", la Comisión ha establecido durante cada año una tarifa a ser cobrada por la compañía para cada zafra desde 1942 a 1946. Y fuimos informados en la vista de este caso que esta práctica ha continuado hasta el presente.

Los hechos no son sustancialmente diferentes en los casos de *Roig* y *South Porto Rico*. Ellos envuelven tarifas provisionales para las zafras de 1945-46. Es cierto que al señalar las vistas para las tarifas provisionales en dichos casos, las órdenes de la Comisión decían que se han iniciado "estudios relacionados con la valoración de las propiedades" de estas compañías. Pero a lo sumo tal estudio es preliminar a la iniciación de un procedimiento, que puede luego ser debidamente radicado a tenor con los requisitos de ley en cuanto a notificación y vista. En verdad, la Comisión podía, luego de tal investigación, concluir que no era necesario procedimiento alguno. Es obvio que la mera celebración de una investigación *ex parte* no constituye la radicación de un procedimiento.

La propia Comisión en efecto admite que no se ha iniciado procedimiento alguno para fijar una tarifa permanente en ningún caso. En su alegato de réplica en el caso de *South Porto Rico* la Comisión afirma que en 1944 realizó estudios de los métodos de contabilidad de las varias compañías y que "también se iniciaron los estudios de valoración" con el fin de establecer una base tarifaria. Sigue la Comisión diciendo

que estos estudios han sido suspendidos hasta que se establezcan normas uniformes para la industria. De acuerdo con la Comisión, "No consideramos que sería buena administración pública el que se procediese a establecer tarifas permanentes sin haber reglamentado la industria azucarera en todos sus aspectos." No nos compete determinar si esta política de dilación por parte de la Comisión al iniciar los procedimientos para tarifas permanentes es sabia. Cumplimos con nuestro deber al resolver que hasta que se inicie un procedimiento sobre fijación de tarifas permanentes para determinada compañía, la Comisión no puede fijar las tarifas provisionales que dicha compañía puede cobrar a sus colonos en virtud del artículo 24 (a).

La Comisión levanta otro punto en apoyo de su práctica de fijar tarifas provisionales para cada zafra por un número de años sin iniciar un procedimiento para fijar una tarifa permanente. En su alegato de réplica en el caso de *South Porto Rico*, dice lo siguiente: "La operación de las centrales azucareras bajo tarifas provisionales, por un número de años, le permitirá a la Comisión el observar el resultado económico de estas tarifas en cada una de las centrales azucareras, de manera que cuando se establezcan las tarifas permanentes, se hará con pleno conocimiento de que éstas han de ser justas y razonables." No nos detenemos a determinar si dicha práctica sería constitucional. Compárense *Prendergast* v. *N. Y. Tel. Co.*, supra, y *Bronx Gas & Electric Co.* v. *Maltbie*, supra, con *Vidal* v. *Fernández*, supra. Una rápida contestación a este argumento es que la Legislatura no ha autorizado tal práctica. Más bien ha copiado el estatuto de Nueva York y ha dispuesto en el artículo 24 (a) que una tarifa provisional será fijada para empresas clásicas de servicio público y para compañías azucareras solamente mientras esté pendiente un procedimiento sobre tarifa permanente.

Durante la vista también se indicó que por razones económicas la Comisión no ha podido iniciar los procedimien-

tos para fijar las tarifas permanentes. Pero este argumento no contesta el mandato específico del artículo 24(a). La Legislatura ordenó a la Comisión que fijara las tarifas permanentes. Como incidental a ello, la autorizó a fijar una tarifa provisional en un procedimiento sobre fijación de tarifa permanente que estuviere pendiente. Pero la Comisión carece de autoridad para fijar la llamada tarifa provisional para un período específico año tras año sin jamás iniciar el procedimiento para fijar la tarifa permanente. Si la Comisión por razones económicas no puede iniciar un procedimiento de tarifa permanente, debe obtener bien los fondos adicionales o enmiendas a los artículos 24(a) y 33(a). Pero, alegando falta de fondos, no puede sencillamente hacer caso omiso del artículo 24(a) y fijar tarifas provisionales donde no se ha iniciado procedimiento alguno para la tarifa permanente.

Precisamente porque un procedimiento para tarifa permanente ni se ha iniciado ni se han hecho esfuerzos para terminarlo lo más pronto posible, creemos que hay considerable fuerza en el argumento de la apelante de que en efecto práctico las tarifas provisionales han pasado a ser tarifas permanentes para la zafra específica para la cual fueron fijadas las llamadas tarifas provisionales.[6] Tal resultado, desde luego, constituiría una violación de la Ley núm. 221, toda vez que las tarifas permanentes deben, de acuerdo con el artículo 33(a), ser fijadas a tenor con la fórmula del caso de *Smyth* v. *Ames*, mientras que las tarifas provisionales pue-

---

[6] El argumento de que estas tarifas provisionales son en efecto tarifas permanentes puede resumirse en la siguiente forma: Es verdad que bajo el artículo 24(a) a las compañías azucareras teóricamente se les podría reintegrar por pérdidas sufridas bajo tarifas provisionales insuficientes, cuando se fijen tarifas permanentes, haciéndolas más altas. Véase *Bronx Gas & Electric Co.* v. *Maltbie*, supra. Pero han pasado ocho años y ningún procedimiento se ha iniciado aún para fijar una tarifa permanente. Aún después de iniciados, estos procedimientos siempre son casi interminables. Además, el Tribunal Supremo ha dicho que "debe reconocerse que cada empresa de servicio público de por sí representa un problema individual." *Driscoll* v. *Edison Co.*, 307 U. S. 104, 119. Esto significa que como entidades de servicio público cada una de las treinta y cuatro compañías

den ser fijadas bajo el artículo 24 (*a*) meramente a base del costo original menos depreciación.

█ La Comisión también arguye que el no haber iniciado un procedimiento sobre tarifa permanente no debe tomarse en consideración por esta corte, ya que la apelante no señala esto como error. La apelante expresamente suscitó este punto como el primer fundamento de su moción de reconsideración ante la Comisión. Ésta denegó la moción sin discutir esta cuestión. La apelante hizo la misma alegación en el párrafo 11 (*g*) de su demanda ante la corte inferior, la cual también hizo caso omiso de la misma. Y aun cuando el primer error aquí está redactado en términos generales, creemos que la apelante pudo haber argumentado este punto bajo la manifestación contenida en el primer error al efecto de que la corte inferior "cometió error al resolver que la Comisión de Servicio Público de Puerto Rico se había ajustado estrictamente a la letra de la Ley núm. 12 . . .". Sea ello como fuere, debe admitirse que no existe en el alegato de la apelante un argumento detallado sobre esta cuestión. Sin embargo, se discutió ampliamente durante la vista del caso. Y se alega extensamente en los alegatos de los *amici curiae* en este caso y en el de la *South Porto Rico* y en el alegato de réplica de la Comisión a este último. Lo más importante de todo, la falta de autoridad en la Comisión para fijar una tarifa provisional cuando no hay pendiente procedimiento alguno sobre tarifa permanente, es sustancialmente igual o por lo menos análoga a falta de jurisdicción. Es el deber de este Tribunal exa-

---

azucareras tiene derecho a una vista completa y separada en cuanto al valor de sus propiedades. También, la naturaleza de la industria azucarera en Puerto Rico contrasta notablemente con la de una empresa clásica de servicio público con un mercado establecido. *Cf. Secretary of Agriculture* v. *Central Roig Refining Co., et al.,* supra; Perloff, *Puerto Rico's Economic Future*, pág. 67 *et seq.* Bajo todas estas circunstancias es sumamente dudoso que las pérdidas, de haberlas, sufridas por las compañías bajo las tarifas provisionales pudieran ser recobradas en un futuro lejano e incierto a través de un plan para fijar, muchos años más tarde, una tarifa permanente más alta de lo que realmente valen los servicios en esa época a ser pagada por el mismo colono o por colonos diferentes en la próxima generación.

minar los defectos jurisdiccionales *motu proprio*. Por tanto, somos de opinión que habríamos estado obligados a basar nuestra sentencia en este punto aun cuando las partes no hubieran llamado nuestra atención al mismo.

Resolvemos que en vista del hecho de que no está pendiente procedimiento alguno para fijar una tarifa permanente, la Comisión carecía de autoridad para fijar las llamadas tarifas provisionales que estableció como tarifas que la Compañía Azucarera del Toa podía cobrar a sus colonos por moler las cañas de éstos durante la zafra 1944–45. Esto hace innecesario que decidamos las innumerables otras cuestiones levantadas en éste y en los casos de *South Porto Rico* y *Roig*, resueltos en el día de hoy a base de esta opinión. Entre las que dejamos sin resolver está la impugnación en los dos últimos casos a la constitucionalidad del artículo 24 (*a*). (⁷)

Creemos que es lamentable que ocho años después de aprobarse la Ley núm. 221, todavía no se hayan fijado, bajo la misma, tarifas válidas para la molienda de las cañas de los colonos. Pero el remedio está en manos de la Legislatura y de la Comisión de Servicio Público, y no en las nuestras.

*La sentencia de la corte de distrito será revocada y se dictará nueva sentencia declarando nulas las órdenes de la Comisión de Servicio de fechas 4 de marzo de 1946 y 20 de diciembre de 1946, fijando las tarifas que la Compañía Azucarera del Toa tiene derecho a cobrarle a sus colonos por molerles sus cañas durante la zafra de 1944–45.*

El Juez Asociado Sr. Negrón Fernández se inhibió.

---

(⁷) Sobre este punto, además de *Bronx Gas & Electric Co.* v. *Maltbie*, supra, *cf. Driscoll* v. *Edison Co.*, 307 U. S. 104, 114, que cataloga ésta como una "novel e importante cuestión" constitucional y la deja pendiente al pasar sobre un estatuto similar de Pensilvania. Para otros casos que interpretan el estatuto anterior, véanse *Beaver Valley Water Co.* v. *Driscoll*, 28 F. Supp. 722 (Dist. Ct., Pa.; 1939); *Edison Light & Power Co.* v. *Driscoll*, 25 F.Supp. 192 (Dist.Ct., Pa., 1938); *Beaver Valley Water Co.* v. *Driscoll*, 23 F.Supp. 795 (Dist.Ct., Pa., 1938); *Edison Light & Power Co.* v. *Driscoll*, 21 F.Supp. 1 (Dist.Ct., Pa., 1937); véanse también, 87 U.Pa.L.Rev. 456; 38 Mich.L.Rev. 72; 34 Ill. L.Rev. 214–17, 929 *et seq.*