CORPORACIÓN AZUCARERA SAURÍ & SUBIRÁ, peticionaria, *v.* JUNTA AZUCARERA DE PUERTO RICO, demandada.

Número 8.

*Sometido:* 8 de julio de 1954. *Resuelto:* 5 de noviembre de 1954.

*Rivera Zayas & Rivera Cestero,* abogados de la peticionaria; *Alejandro Romanace,* abogado de la demandada.

EL JUEZ ASOCIADO SEÑOR MARRERO emitió la opinión del Tribunal.

En 6 de julio de 1950 Julio Rosado Cruz y la Corporación Azucarera Saurí & Subirá, dueña esta última de la Central Constancia,(¹) otorgaron ante notario la escritura pública número 43 sobre "Contrato de Molienda de Cañas."(²) De conformidad con esa escritura el colono, dueño de tres pequeñas fincas rústicas se comprometió: a tener sembradas y cultivadas para las zafras correspondientes a los años 1950–51

---

(¹) En lo sucesivo nos referiremos a Rosado Cruz como "el colono" y a la Corporación Azucarera Saurí & Subirá como "la Central."

(²) Véase la Ley núm. 37 de 10 de marzo de 1910, pág. 122, según ha sido enmendada.

a 1959–60 seis cuerdas de cañas dulces de ciertas variedades que se especifican, extendiéndose el contrato además a todas aquellas cañas que en adición a las ya indicadas produjeran en cada una de las referidas zafras las fincas en cuestión; a cultivar dichas fincas en buenas condiciones y a no cortar las cañas mientras no se ordenara su corte por la central, así como a enviar a ésta solamente cañas buenas, sanas y bien maduras, colocándolas en camiones o vagones para ser conducidas a la central; a entregar durante cada zafra diez o más toneladas de caña diariamente; a hacer de su cuenta, cargo y riesgo todos los gastos de cultivo en sus plantaciones de cañas, desde la preparación del suelo hasta cargar éstas en los camiones o vagones, así como a pasar a la central antes del primero de octubre de cada año una relación escrita de las cañas que supone habrá maduras en cada uno de los meses de la zafra subsiguiente, a fin de que la central pueda hacer los arreglos necesarios para la ordenación de los cortes, transporte y molienda de cañas conforme al contrato; a estar y pasar por el peso que indique la romana que la central tiene instalada en el batey de su factoría, pudiendo con tal fin designar un representante suyo y los auxiliares necesarios cerca de la romana y laboratorio de la central para observar e intervenir con el tarado de los camiones y vagones; a no hacer compromisos con otras personas para venderles las cañas que puedan producir las tres fincas en cuestión; y a que el contrato de moliendas de cañas fuera inscrito preferentemente a todo otro gravamen.

A virtud de ese contrato, la central asumió, por su parte, la responsabilidad de las cañas del colono en cuanto a su transportación al molino, su protección contra accidentes y mermas, así como la de bonificar al colono el importe de lo que fije la Comisión de Servicio Público de Puerto Rico, o cualquiera otra agencia o funcionario del gobierno insular o federal, si el arrastre o transporte de las cañas fuere hecho por el colono, debiéndose observar en todo lo relativo al arrastre y transporte de las mismas lo que por reglas, reglamen-

tación u órdenes legales disponga la Comisión de Servicio Público de conformidad con la Ley núm. 221 de 1942 ((1) pág. 1177) y sus enmiendas, o en armonía con cualquier otra reglamentación existente de cualquier agencia insular o federal; y a admitir el acceso de un representante del colono y de los auxiliares necesarios para que observen e intervengan en el tarado de los camiones y vagones y a brindar a dichas personas las facilidades razonables para el desempeño de su cometido, teniendo derecho a traspasar en todo o parte a sus sucesores el contrato con todo o parte de sus derechos, privilegios o consecuencias.   Como aclaración del contrato se hizo constar asimismo que la central organizaría sus trabajos para cada época de molienda contando con la puntual entrega de las cañas por el colono y que esa puntual entrega de las cañas será necesaria para la buena marcha de los trabajos de la factoría durante el referido término, y que si el colono deja de sembrar, cultivar y entregar las cañas según ha convenido en el contrato de molienda, ello causaría perjuicios grandes e irreparables a la central; entendiéndose además que el contrato queda en todo sujeto a cualquier limitación o restricción válida impuesta por el gobierno insular o federal en relación con la actual ley de restricción en la producción de azúcar, tanto a la central como al colono, y comprometiéndose cada una de las partes a cumplir con todas las órdenes y restricciones válidas sobre control que dicte el gobierno.   Como ampliación de lo anterior se hace constar además en el contrato que la central no estará obligada a pagar al colono por las cañas que éste no pueda entregar, o que la central no pueda moler debido a las disposiciones del gobierno federal o insular o de cualquier agencia o funcionario de esos gobiernos, quedando asimismo relevada la central de las obligaciones que hubiera contraído de hacer anticipos para corte y tiro de dichas cañas y demás atenciones de las mismas.(3)   El con-

---

(3) Hemos copiado extensamente del contrato de molienda de cañas a fin de que se vea cuáles fueron las obligaciones contraídas por cada uno de los contratantes.

trato así otorgado fué inscrito por el registrador de la propiedad en el registro de contratos agrícolas de Ponce el 28 de julio de 1950. ([4])

Así las cosas, en 19 de agosto de 1953 el colono se dirigió a la Junta Azucarera de Puerto Rico indicándole que de acuerdo con el artículo IV del Reglamento de la Junta era su deseo cambiar la molienda de sus cañas de la Central Constancia, de Ponce, a la Central San Francisco, de Guayanilla. A esa solicitud se opuso por escrito la central. Celebróse una vista ante la Junta Azucarera y ambas partes comparecieron. En 29 de octubre de 1953 la Junta dictó una orden declarando sin lugar la oposición de la central y ordenando al colono que moliera sus cañas en la Central San Francisco para la zafra de 1954. Esa orden está basada en una "Relación de Hechos, Opinión y Resolución" en la cual figura lo siguiente:

"En el contrato formal, de acuerdo con sus términos, la Central no se obliga a proporcionarle al colono refacción de clase alguna para el cultivo de sus cañas... Aunque bajo el contrato de molienda por 10 años formalizado por el colono y la Central, ésta no está obligada a refaccionar al colono, algunos de estos vales [refiriéndose a las distintas cantidades entregadas por la central al colono como anticipo] constituyen evidencia de refacción para la zafra para la cual se hizo el anticipo. La Central no hizo anticipos de dinero al colono durante el año 1953 por concepto de refacción agrícola para la cosecha de 1954 y no existe por lo tanto, contrato de refacción entre el colono y la central para la zafra de 1954.

"Las cañas del colono Juan Rosado Cruz (sic) molidas por la Central Constancia durante la zafra 1949-50 (sic) eran cañas nuevas y el colono era para dicha zafra un colono nuevo de la central.

"Esta Junta toma conocimiento judicial que para el 6 de julio de 1950, fecha en que se formalizó el contrato entre la central y el colono, estaba vigente una orden de zonificación promulgada por la Comisión de Servicio Público el 12 de abril de 1944 ordenando y limitando a cada central azucarera a moler

---

([4]) El contrato de molienda de cañas se formalizó por las partes después de haber obtenido de la Production Marketing Association la autorización correspondiente.

aquellas cañas procedentes de los mismos terrenos que las cañas molidas durante la zafra de 1942-43 y prohibiendo que ninguna central acepte moler cañas de colonos nuevos, o cañas procedentes de terrenos de nuevo cultivo, a menos que medie una previa autorización de la Comisión de Servicio Público.(⁵)  No consta de los registros de la Comisión de Servicio Público que obran en los archivos de esta Junta por mandato legislativo, que la central Constancia de Ponce solicitara permiso para moler las cañas del colono Julio Rosado Cruz para la zafra de 1949–50 ni para la zafra de 1950-51.

"... . . . . . .

"A virtud de la facultad que como agencia administrativa le confiere la Ley Azucarera, esta Junta ordenó a su químico inspector Sr. Angel Carrero Ruiz, que realizara una investigación en los archivos y récords de la Central Constancia, sobre la forma en que habían sido liquidadas, por dicha Central, las cañas del colono Julio Rosado Cruz durante las zafras de los años 1950-51, 1951-52 y 1952-53.  El informe del químico inspector se hace formar parte de esta resolución.

"... . . . . . .

"En el contrato de referencia la central se obliga a moler las cañas del colono y el colono a enviarle sus cañas a la Central Constancia por un término de 10 zafras consecutivas.  Tal obligación les era impuesta al colono y a la central por la ley vigente en la fecha en que se formalizó el contrato.  No existe, por lo tanto, el requisito que exige el art. 1213 del Código Civil(⁶)...

(⁵) La parte dispositiva de la orden de zonificación dictada por la Comisión de Servicio Público en 12 de abril de 1944, reza así:

"POR TANTO, la Comisión resuelve;

"(1)  Ordenar, como por la presente ordena, que cada central azucarera de Puerto Rico sujeta a la jurisdicción de esta Comisión estará limitada a moler aquellas cañas procedentes de los mismos terrenos que las cañas molidas durante la zafra de 1942–43;

"(2)  Prohibir, como por la presente prohibe, que ninguna central acepte moler cañas de un colono que durante la zafra de 1942–43 hubiera molido sus cañas en otra central, o cañas de nuevos colonos, o cañas procedentes de terrenos de nuevo cultivo, a menos que medie una previa autorización de la Comisión de Servicio Público.

"(3)  Ordenar, como por la presente ordena, que esta resolución sea notificada individualmente a cada una de las compañías azucareras de Puerto Rico, y publicada para conocimiento de todos los colonos y del público en general."

(⁶) El art. 1213 del Código Civil prescribe:

"No hay contrato sino cuando concurren los requisitos siguientes:

"1. Consentimiento de los contratantes.

Estando la central en este caso obligada por ley a molerle las cañas al colono, no existe, por lo tanto, causa que le dé validez al contrato de molienda. Además, el contrato no es válido porque está contra el orden público y las leyes por no haber solicitado la central el permiso de la Comisión de Servicio Público requerido por la orden promulgada por la Comisión de Servicio Público el día 12 de abril de 1944.

"     .     .     .     .     .     .

"Comprometerse a pagar al colono el 65% del rendimiento de sus cañas . . . no constituye causa suficiente . . . de acuerdo con el informe rendido por el químico inspector de esta Junta . . . que obra en autos . . . Durante tres años consecutivos 1950–51, 1951–52 y 1952–53 el colono ha venido recibiendo el 66.125%, el 66.969% y el 67.175%, respectivamente, del rendimiento de sus cañas, tal como lo dispone la reglamentación federal e insular en vigor. Asegurar al colono una participación menor de lo que ha venido recibiendo bajo la protección por muchos años de la leyes que establecen participaciones mínimas para el colono no puede constituir causa válida. . . .

"     .     .     .     .     .     .

"Cumplir y no más con las leyes en vigor en el momento en que se formalizó el contrato y las que pudiesen aprobarse en el futuro no es causa por sí sola suficiente para que un colono se obligue a rendir esa libertad . . . La Junta . . . es de opinión que el contrato de molienda . . . está en contravención con el espíritu de la Ley Azucarera de 1951 ([7]) y con el interés público."

De la orden así dictada por la Junta, la central solicitó reconsideración en su oportunidad. Celebrada una vista en relación con la misma, la reconsideración fué declarada sin

"2. Objeto cierto que sea materia del contrato.
"3. Causa de la obligación que se establezca."

([7]) Ley núm. 426 de 13 de mayo de 1951 (pág. 1139), conocida con el título breve de "Ley Azucarera de Puerto Rico." Según el art. 3 de esa Ley:

"Para que un colono tenga derecho a cambiar de la central donde muele sus cañas a otra central, vendrá obligado a notificar a las centrales afectadas su intención de hacer dicho cambio no más tarde del día 1 de noviembre anterior a la zafra en que intenta hacer dicho cambio.

"La central vendrá obligada a moler las cañas de los nuevos colonos, a menos que la Junta exima a la central de tal obligación luego de haberse demostrado ante la Junta que la Central carece de suficiente capacidad para asumir la molienda de las cañas de dichos colonos."

lugar. Acudió entonces la central ante este Tribunal con una petición(⁸) en la cual, luego de exponer en síntesis los hechos que dan lugar a su recurso, alega que la Junta cometió los siguientes errores: (1) al aplicar retroactivamente al antedicho contrato de molienda las disposiciones de la Ley Azucarera de Puerto Rico, excediéndose así en sus poderes administrativos y ejercitando poderes judiciales de que carece, menoscabando obligaciones contractuales, perjudicando derechos adquiridos al amparo de legislación anterior y privando a la peticionaria de su propiedad sin el debido proceso de ley; (2) al declarar ineficaz y nulo el contrato de molienda por falta de causa, concluyendo que las obligaciones recíprocas asumidas por los contratantes eran deberes impuestos por ley y que por tanto no podían constituir causa válida para el contrato; (3) al no resolver que el término de 10 zafras fijado para la duración del contrato constituía causa válida en derecho, ya que la manifiesta intención de las partes fué dotar el negocio o empresa común de producción y venta de cañas y azúcar de una base de razonable permanencia y estabilidad que asegurase un promedio anual de toneladas de caña suficiente para servir de garantía al financiamiento de la empresa y hacer posible la concesión de préstamos refaccionarios a los colonos, mejorar y promover la eficencia técnica del molino para beneficio de los propios colonos, de la central y de la industria azucarera en general; (4) al no declarar como un hecho establecido que la peticionaria se comprometió, por convenio privado separado y en consideración a la entrega y molienda de las cañas, a darle refacción al colono durante el término del contrato, a solicitud del colono, y al no declarar que este contrato de refacción constituía de por sí causa suficiente y válida del contrato de molienda de cañas; (5) al confundir la causa del contrato con la ejecución posterior del mismo, resolviendo que la forma en que la central liquidó y pagó la participación del colono demostró que el contrato carecía de causa válida y eficaz; (6) al declarar la existencia

---

(⁸) Véase el art. 33 de la Ley 426 de 1951, supra.

y aplicación a este caso de una orden de zonificación promulgada por la Comisión de Servicio Público el 12 de abril de 1944, que limitaba cada central azucarera a moler cañas procedentes de determinados terrenos, y prohibiendo que ninguna central aceptara colonos nuevos sin previa autorización de la Comisión; y (7) al resolver el caso a base de prueba procurada y obtenida por ella *motu proprio* después de terminada la vista, y sin previa notificación y audiencia de la peticionaria, en violación del debido proceso de ley.

Los siete errores así señalados son discutidos por la peticionaria en un extenso alegato por ella radicado. En respuesta a ese alegato la Junta querellada sostiene que "indudablemente que de no existir la Ley Azucarera vigente y la Ley 221 en la fecha que se formalizó el contrato de molienda en controversia tal contrato hubiera sido a todas luces legal, porque había prestaciones mutuas, o sea, la obligación del colono de abastecer su caña de azúcar a la central Constancia era el fundamento de la obligación de la central de molerle esa caña en su ingenio." Arguye, sin embargo, que según el art. 4 del Código Civil, ed. 1930, "son nulos los actos ejecutados contra lo dispuesto en la ley, salvo los casos que la misma ley ordene su validez,"(⁹) y que no habiendo el colono y la central dado cumplimiento a la orden dictada por la Comisión de Servicio Público en 12 de abril de 1944 que prohibía que cualquier central aceptara moler cañas de nuevos colonos a menos que mediara una previa autorización de la Comisión de Servicio Público, el contrato por ellos otorgado era nulo e inexistente.

En respuesta a esa contención de la Junta, la central alega que este Tribunal resolvió en los casos de *Cía. Azucarera Toa* v. *Com. Serv. Público*, 71 D.P.R. 212, y en *Godreau & Co.* v. *Com. Servicio Público*, 71 D.P.R. 649 que el reglamento general de la Comisión de Servicio Público fijando tarifas pro-

(⁹) El art. 1207 del Código Civil, edición de 1930, dispone además que:
"Los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral ni al orden público."

visionales a ser cobradas por las centrales para moler las ca-
ñas de sus colonos era nulo, que de ahí en adelante las cen-
trales tuvieron el camino expedito para contratar libremente
con los colonos el precio o porcentaje de rendimiento que debía
recibir por sus cañas y que al desaparecer la tarifa provisio-
nal cayeron también por su base y dejaron de tener efecto to-
das las disposiciones de dicho reglamento general relativas a
servicios de molienda etc. a los colonos, entre los cuales figu-
raba el art. 15 (a) de dicho reglamento que disponía que "cada
compañía estaba limitada a moler cañas de terrenos que pro-
dujeron cañas que se molieron en la misma central durante la
zafra de 1943, excepto cuando la Comisión haya autorizado
transferencias." Continúa alegando la central que en el caso
de *Godreau,* supra, este Tribunal se expresó a las páginas 661
y 663 en los siguientes términos:

". . . Pero al tratar conjuntamente las tarifas y servicios en
el artículo 21, la Legislatura reconoció que las tarifas, los ser-
vicios y las facilidades están inextricablemente entrelazadas. Es
decir, la Comisión no podía ordenar servicios a ser prestados sin
al mismo tiempo o con anterioridad haber fijado las tarifas a
cobrar por tales servicios. Resolver lo contrario sería hacer caso
omiso del mandato de la Legislatura al efecto de que cada com-
pañía debe recibir un beneficio razonable sobre el valor justo de
sus bienes.

". . . . . . .

"Es obvio que aquellas disposiciones del Reglamento General
que directamente afectan los servicios a ser rendidos por las
compañías, no pueden subsistir por dos motivos. En primer
lugar, son nulos porque la Comisión hasta el presente no ha fi-
jado tarifas válidas, provisionales o permanentes, a ser cobra-
das por los mismos. *Compañía Azucarera del Toa* v. *La Comi-
sión de Servicio Público de Puerto Rico,* supra. En segundo lu-
gar, independientemente del hecho de que la Comisión no puede
ordenar la prestación de servicios sin fijar tarifas para los mis-
mos, el llamado Reglamento aquí envuelto, en cuanto afecta di-
rectamente servicios a ser rendidos por las compañías, no es un
reglamento general sino una orden individual que, según ya he-
mos visto, requiere de acuerdo con las Leyes núms. 70 y 221, una

audiencia, prueba, conclusiones de hecho, y resoluciones sujetas a revisión judicial. Y estos requisitos no fueron cumplidos aquí.

"Es indudable que debido a que la Comisión (1) no fijó tarifas y (2) no celebró audiencias, no llegó a conclusiones de hecho y no dictó órdenes sujetas a revisión judicial, son nulas aquellas disposiciones del Reglamento General que directamente afectan los servicios a ser rendidos por las compañías. . . ."

Es cierto que en los casos de *Cía. Azucarera Toa* y *Godreau & Co.*, supra, nos expresamos en la forma indicada por la peticionaria, mas no damos a lo en ellos resuelto ni a las palabras citadas más arriba entre comillas el alcance que les da la peticionaria. En cuanto a que la Comisión no podía fijar tarifas provisionales a no ser que estuviera pendiente algún procedimiento para la fijación de tarifas permanentes, estamos enteramente de acuerdo. Empero, en el segundo de los casos citados estaba envuelta más bien la facultad de la Comisión de Servicio Público para fijar y determinar precios, tipos, tarifas, etc. en armonía con el art. 21 de la Ley 221 de 1942, que convirtió a las centrales en compañías de servicio público. En ese caso dijimos (pág. 658) que en él la Comisión había seguido "el procedimiento establecido para la promulgación de reglamentos generales y no aquél establecido para resoluciones que afecten casos individuales." Resolvimos en él además (pág. 663) que era "indudable que debido a que la Comisión (1) no fijó tarifas y (2) no celebró audiencias, no llegó a conclusiones de hecho y no dictó órdenes sujetas a revisión judicial, son nulas aquellas disposiciones del Reglamento General que directamente afectan los servicios a ser rendidos por las compañías," y que "caen en esta categoría el art. 7, que provee para arrastre y arrimo de caña; el art. 11, que provee para la liquidación de cañas y disposición y pago de azúcar; el art. 12, que trata de la liquidación de mieles; y el art. 19, que provee para las tarifas a cobrarse," y que "las disposiciones restantes caen en una categoría diferente." Entre esas disposiciones restantes lo está el art. 15(*a*) que dispone lo que ya se ha indicado. Así pues, lejos

dé resolver en el último caso citado, como sostiene la peticionaria, que el art. 15 (a) había caído por su base, manifestamos claramente que éste caía en una categoría distinta y en cuanto al mismo, así como en cuanto a otros artículos, desestimamos el procedimiento por falta de jurisdicción.

■ La resolución de la Comisión de Servicio Público de 12 de abril de 1944 no fué promulgada a tenor de la facultad conferídale por el art. 21 de la Ley 221 de 1942. Lo fué más bien en armonía con lo dispuesto en el art. 42 de la misma ley, preceptivo de que:

"Dentro de un año, a contar desde la fecha de aprobación de esta Ley, la Comisión procederá a determinar y poner en vigor la zona de producción de toda compañía azucarera y de toda persona natural o jurídica que en Puerto Rico se dedique a la manufactura, elaboración o refinación de azúcar."

A virtud de esa resolución la Comisión resolvió (1) ordenar que cada central azucarera de Puerto Rico estará limitada a moler aquellas cañas procedentes de los mismos terrenos que las cañas molidas durante la zafra de 1942–43; ([10]) (2) prohibir que ninguna central aceptara moler cañas de un colono que durante la zafra de 1942 ó 1943 hubiera molido sus cañas en otra central, o cañas de nuevos colonos, o cañas procedentes de terrenos de nuevo cultivo, a menos que mediara una previa autorización de la Comisión de Servicio Público; y (3) ordenar que su resolución fuera notificada individualmente a cada una de las compañías azucareras de Puerto Rico y publicada para conocimiento de todos los colonos y del público en general. ([11])

---

([10]) Hasta aquí la resolución de 12 de abril de 1944 es casi idéntica al art. 15 (a) del reglamento de la Comisión interpretado en el caso de *Godreau & Co.* v. *Comisión de Servicio Público*, supra.

([11]) Según el art. 102, inciso 32 de la Ley de Evidencia es presunción controvertible "que la ley ha sido acatada." En su consecuencia, debe presumirse que se dió cumplimiento estricto a lo dispuesto en el párrafo tercero de la resolución de 12 de abril de 1944, y por ende que la Comisión de Servicio Público notificó dicha resolución individualmente a cada una de las compañías azucareras de Puerto Rico y que publicó la misma para conocimiento de todos los colonos y del público en general.

Esa resolución, cuyo alcance no fué otro que autorizar la continuación de la molienda de caña en la forma que se había hecho durante la zafra de 1942–1943 y prohibir que una central aceptara cañas de un colono que durante dicho año hubiera molido en otro molino, o cañas de nuevos colonos o procedentes de terrenos de nuevo cultivo, sin la previa autorización de la Comisión de Servicio Público, fué una reglamentación perfectamente válida adoptada de acuerdo con el precepto estatutario antes indicado (art. 42 de la Ley 221 de 1942).

■■ Es admitido por todos que Rosado Cruz era un colono nuevo. Por tanto, la previa autorización de la Comisión para moler sus cañas era necesaria. Como de los autos no aparece en forma alguna que para la celebración del contrato entre el colono Rosado Cruz y la central, aquí peticionaria, se obtuviera la previa autorización de la Comisión de Servicio Público, el contrato entre ellos celebrado es enteramente nulo. Decimos esto porque la indicada resolución de la Comisión de 12 de abril de 1944, adoptada bajo un estatuto que la autorizaba para hacerlo, tenía fuerza de ley y de ella podía la Junta tomar conocimiento judicial. *Molini* v. *Soc. Mario Mercado e Hijos*, 73 D.P.R. 937, 943. Y porque además conforme al art. 4 de nuestro Código Civil: "son nulos los actos ejecutados contra lo dispuesto en la ley, salvo los casos en que la misma ley ordene su validez." La palabra nulos, tal cual se usa en ese artículo tiene el alcance de nulo *per se*, de inexistente. Así ha sido interpretado. Don José Castán Tobeñas se expresa del siguiente modo en el tomo segundo, sexta ed., págs. 642–43 de su obra "Derecho Civil Español Común y Foral":

"En nuestro Código Civil no aparece el término *inexistencia* (pues sólo se habla, en general, de actos nulos)
". . . . . . . .

"Puede considerarse en nuestro derecho, inexistente o radicalmente nulo el contrato en los siguientes casos:
". . . . . . . .

"*b*) Cuando el contrato se ha celebrado en violación de una prescripción o prohibición legal, fundado sobre motivos de orden público (hipótesis del art. 4 del Código) ;"

Oyuelos nos dice en el tomo 1 de su Digesto a la página 7 que:

"Debe estimarse que no existe pacto, convenio ni contrato entre los que contrataron contra la prohibición de la ley. . . . (7) los pactos convenidos contra el derecho no tienen validez."

El Tribunal Supremo de España nos dice en su Sentencia de primero de abril de 1931, 199 Jur. Civ. 397 que "la nulidad a que alude el artículo 4º del Código Civil se deriva de la infracción de ciertas leyes prohibitivas, cuyo olvido o desconocimiento es bastante para hacer esta declaración; cosa distinta de los actos anulables.

■ Siendo inexistente y nulo *per se* el contrato de molienda de cañas celebrado por el colono y la central, la orden de la Junta no puede haber menoscabado en forma alguna la obligación de tal contrato ni, por ende, haber privado a la peticionaria de su propiedad sin el debido proceso de ley.

■ La Junta cometió, sin embargo, un error que aunque no afecta el resultado a que en definitiva llegamos es conveniente mencionar, a fin de que entidades administrativas como la aquí envuelta no persistan en su comisión. La Junta hace constar en su opinión que a virtud de la facultad conferídale ella ordenó a su químico inspector que realizara una investigación en los archivos y récords de la central sobre la forma en que habían sido liquidadas por ésta las cañas del colono durante varias zafras, hizo que ese informe formara parte de su resolución y lo tomó en consideración al resolver el caso que tenía ante su consideración. Ella procedió así sin dar oportunidad a la peticionaria para intervenir en relación con esa prueba. Conforme dijimos en *Escudero* v. *Junta Salario Mínimo*, 66 D.P.R. 594, 599:

"Si la Junta creyese necesario, después de terminada una audiencia pública y antes de emitirse un decreto, obtener mediante investigación alguna información que se propone tomar en consi-

deración al decidir un caso, debe como cuestión de debido procedimiento hacer llegar a las partes interesadas los resultados de la investigación y concederles una oportunidad de contrainterrogar y de refutar antes de decidir el caso."

El proceder seguido por la Junta a este respecto fué, por tanto, erróneo.   No obstante, dada la conclusión a que hemos llegado sobre la inexistencia del contrato, ése no es un error que da lugar a la revocación de la orden recurrida.

En vista de lo antes expuesto no es menester discutir los demás errores señalados por la peticionaria.

*La orden de la Junta Azucarera será confirmada, con costas y gastos a la peticionaria.*

Los Jueces Asociados Sres. Negrón Fernández, Ortiz y Sifre no intervinieron.

El Juez Asociado Sr. Belaval está conforme con el resultado.