## GREAT NORTHERN RAILWAY COMPANY *v.* CAHILL ET AL., COPARTNERS AS REDMAN & CAHILL, ET AL.

### ERROR TO THE SUPREME COURT OF THE STATE OF SOUTH DAKOTA.

No. 124.   Argued January 13, 1920.—Decided May 17, 1920.

An order of a state railroad commission requiring a railroad to install and maintain cattle scales, passed to facilitate trading in cattle and not for any reason having substantial relation to their transportation, violates due process of law. P. 75. *Great Northern Ry. Co.* v. *Minnesota*, 238 U. S. 340.

40 S. Dak. 55, reversed.

THE case is stated in the opinion.

*Mr. E. C. Lindley,* with whom *Mr. M. L. Countryman, Mr. F. R. Aikens* and *Mr. H. E. Judge* were on the brief, for plaintiff in error.

*Mr. Oliver E. Sweet,* Assistant Attorney General of the State of South Dakota, with whom *Mr. Clarence C. Caldwell,* Attorney General of the State of South Dakota, and *Mr. P. W. Dougherty* were on the brief, for defendants in error.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

In *Great Northern Ry. Co.* v. *Minnesota,* 238 U. S. 340, the question was whether an order of the Railroad & Warehouse Commission of Minnesota directing the railway to install at a named station a cattle-weighing scale was rightly sustained by the Supreme Court of the State. It

was found by that court (a) that out of 259 stations on the
railway line in Minnesota where stock yards for handling
cattle existed there were but 54 supplied with cattle-
weighing scales, all of which the railway had voluntarily
installed; (b) that although such scales had no direct part
in transportation, they were convenient in stock dealings
and a station possessing one had an advantage over a place
where none existed; in fact, that at the 54 stations where
they had been voluntarily installed it had come to pass
that they were used, not by shippers for the purposes of
their transportation business, but by those who bought
and sold cattle.

Coming to consider the contention of the railway that
the order to put in the scales was repugnant to the Four-
teenth Amendment as a taking of its property without due
process, since as a carrier no obligation rested upon it to
put in the scales, it was pointed out that the test was
whether the order was so arbitrary and unreasonable as to
exceed the power of government, or was justified by the
public necessities which the carrier could lawfully be com-
pelled to meet. Holding that as the duty of the railway
was confined to furnishing appliances for its business of
transportation and that cattle scales were not of such a
character it followed that the railway could not be com-
pelled to supply them as a means for building up the busi-
ness of trading in cattle however much the public might
be benefited thereby, the defense of the railway was main-
tained and the order of the Commission was held to be
wanting in due process and void. The result, it was
pointed out, could not be avoided by the suggestion that
the order was intended to correct a discrimination which
existed in favor of certain stations which had scales, since
in substance to say that would be to correct one discrimin-
ation by creating another.

Shortly before the argument in this court of the *Minne-
sota Case* just referred to, the firm of Cahill and Redman

petitioned the Board of Railroad Commissioners of South Dakota for an order requiring the Great Northern Railway Company to install and maintain a cattle scale adjacent to its cattle yards at Albee station. It was alleged in the petition that no means otherwise of weighing cattle existed at Albee; that the public necessities of the cattle trade required the scale and that the number of cattle shipped from the place justified the outlay by the railway.

The railway answered denying any duty on its part to install the scale and asserted that to compel it to put the scale in would deprive it of its property without due process and would besides deny it the equal protection of the laws, both in violation of the Fourteenth Amendment.

At the hearing which followed there was no showing that any cattle had been shipped over the railway into Albee. It was indisputably established, however, (a) that not only the defendant railway but the other roads operating in the State of South Dakota had at some of their stations installed stock yard scales which presumably, in the absence of all proof to the contrary, had been voluntarily installed; (b) that all shipments of cattle from Albee during the preceding three years amounted only to 56 carloads, all of which were moved in interstate commerce, that is, to St. Paul, Minnesota, and that with regard to less than carload lots two cattle shipped in intrastate commerce constituted the sole movement; (c) that the universal rule on all railroads throughout the United States is to determine the weight of cattle shipped in carload lots, for the purposes of ascertaining the freight charges, not by weight taken on scales at the point of shipment, but by a track scales at or adjacent to the point of delivery; (d) that the business of dealing in cattle at Albee would be facilitated and probably increased by the existence there of a cattle scale where cattle dealt in could be weighed, and that the public want in this respect had come to be increasingly felt since the removal by its owner of a

private scale which the public had used at a time previous
to the demand made upon the railway to install the cattle
scale here in question.

The Commission in its findings, while pointing out that
the complainants had testified that, besides the benefit to
the public, there would be an advantage to shippers by the
establishment of the scale as it would enable the shippers
to load their cattle so as to avoid any loss resulting from a
failure to bring the loaded car up to the minimum weight
required for carload shipments, added the following: "The
testimony of the other witnesses, including those appear-
ing for the railway company, is to the effect that the only
use to which a stock scale is put is for the accommodation
and convenience of stock buyers and persons making sales
of live stock to the buyers at stockyards in arriving at the
weights as to the basis for the purchase and sale."

In the meanwhile the *Minnesota Case* had been decided
and therefore, when the Commission came to apply the
law to the facts by it found in this case, it was called upon
to determine how far the ruling in that case deprived it of
power to grant the relief prayed in this. Discharging that
duty, it held that the *Minnesota Case* was inapplicable
because in South Dakota there was a common knowledge
that railroad cattle scales when established were for the
benefit of both the public and shippers, enabling all who
took cattle into the railroad yards whether for shipment or
otherwise to ascertain their weight. After referring to the
relation in certain aspects which cattle scales when in-
stalled bore to carload and less than carload shipments and
that a law of the State provided for the inspection of cattle
scales when installed by railways at their cattle yards, it
was pointed out that, in accordance with many adjudged
cases establishing that it was a part of the duty of a carrier
to install stock yards in which to hold cattle intended for
shipment and to receive inbound cattle when unloaded, it
had by further legislation been made the duty of carriers

to establish stock yards at their stations.  Declaring that
no difference in principle existed between the duty to
furnish stock yards and the duty to install stock scales, the
conclusion of the Commission was thus summed up:

"After a very careful examination of the evidence in
this record, this commission is of the opinion and finds
that live stock scales are a necessary facility at stockyards
for the weighing of live stock received for the purposes of
shipment, not only for the convenience of the public at
large, live stock buyers and individual shippers, but in the
necessary weighing preliminary to properly loading and
subsequent to the unloading of live stock at such stock-
yards, and that there is an actual public necessity for the
installation of a stockyards scale at the stockyards of the
defendant at its station at Albee, in Grant County, in this
state."

Conforming to these conclusions, the order awarded
directed the installation of a stock scale of a certain
capacity "in such a manner as to permit of the weighing
of live stock loaded into and unloaded from cars at that
station, as well as the weighing of stock received into the
stockyards at Albee."

An intermediary court to which the case was removed
held that as the furnishing of a stock scale was no part of
the duty of a common carrier, the railway could not be
compelled to furnish it without taking its property without
due process of law, and that this result would be all the
more flagrantly brought about by compelling the railway
to furnish the scale upon the theory that if furnished it
would afford a facility for the trading in cattle at the place
where it was installed.

The complainant and the Board of Railroad and Ware-
house Commissioners, as appellants, in invoking the re-
versal of the judgment of the intermediary court and the
affirmance of the order of the Board, as stated by the Su-
preme Court of the State, in that court relied solely upon

two grounds: "First, that local buyers and sellers of live stock have the right to demand the installation of stock-yard scales for their own convenience in buying live stock; and second, that it is the duty of the carrier to furnish the shipper such facilities as will enable him to avoid under-loading cars where the rate is fixed upon minimum loads, and to ascertain the cost of shipping stock in a car in excess of the minimum carload weight."

Disposing of the first of these contentions the court said: "The fallacy of the first proposition is so clear that discussion would be idle. The carrier owes no duty to the local buyer or seller of live stock until the stock is tendered at the stockyards for shipment."

In passing upon the second proposition the court quoted a passage from a text book (10 Corpus Juris, 59, 79) in which, after stating the general duty of a common carrier to furnish appliances necessary or appropriate for discharging its duties as a common carrier, it was declared: "The duty of a carrier of live stock, it is said, cannot be efficiently discharged without the aid of pens or yards in which the live stock offered for shipment can be received and handled, with safety and without inconvenience to the public, before being loaded in the cars in which they are to be transported; and such duty is strictly analogous to the duty of the carrier to construct and to maintain a secure depot for inanimate freight."

Applying such doctrine the court, without citation of authority or reference to any legislative enactment or administrative practice supporting the view, and without referring to the South Dakota statutes relied upon by the Board, making it obligatory upon the carrier to put in cattle pens at all stations, without imposing any such duty to put in cattle scales, but on the contrary giving power only to inspect such scales when put in, held, wholly as a matter of first impression, that the identity between the two (cattle yards and cattle scales) was so complete that

the obligation which existed to erect cattle yards at every station also established the duty to install a cattle scales at every station. The judgment of the intermediary court was therefore reversed and the order of the Board affirmed.

Eliminating, as this conclusion did, all the questions pressed before the Board obviously with the purpose of taking the case out of the reach of the *Minnesota* decision, based upon a supposed duty to put in scales because of the advantage which would result to dealers in cattle, it clearly follows that this case is decisively controlled by the ruling in the *Minnesota Case*, and therefore leaves us only the duty to apply that ruling. Coming to do so, the judgment below is therefore reversed and the cause remanded with directions for further proceedings not inconsistent with this opinion.

*It is so ordered.*