MARIO ESCUDERO, recurrente, *v.* JUNTA DE SALARIO MÍNIMO DE PUERTO RICO, demandada.

Núm. 102.—*Sometido:* Diciembre 10, 1945.   *Resuelto:* Mayo 10, 1946.

*Joaquín Velilla,* abogado del recurrente; *Ismael Soldevila,* abogado de la demandada.

El Juez Asociado Señor Snyder emitió la opinión del tribunal.

Esta es una solicitud de revisión del decreto de la Junta de Salario Mínimo fijando salarios mínimos, horas de labor y condiciones de trabajo a la industria de la leche en Puerto Rico.

El peticionario argumenta conjuntamente los siguientes errores señalados: la Junta dejó incumplidas las disposiciones de la sección 12 de la Ley núm. 8, Leyes de Puerto Rico, 1941 ((1) pág. 303), ya que sólo investigó la condición de los obreros y no tomó en consideración el costo de producción, la situación financiera y económica de la industria y las condiciones especiales prevalecientes en Puerto Rico; la contabilidad de agricultores típicos, de distintas regiones y con producciones diversas, demuestra que la industria no

está en condiciones de absorber las escalas decretadas; el decreto es nulo, toda vez que no está basado en prueba sustancial; y los salarios fijados por el decreto son confiscatorios y privan al peticionario de su propiedad sin el debido procedimiento de ley toda vez que de la prueba practicada aparece que ha estado haciendo negocios sufriendo considerable pérdida pagando salarios más bajos que aquéllos provistos en el decreto.

■ Un examen del récord demuestra que la Junta tomó en consideración todos los factores señalados en la sección 12 y que en la evidencia había base suficiente para su decreto. Además, después de aprobarse este decreto, la Oficina de Administración de Precios autorizó un aumento en el precio de venta de la leche. Bajo estas circunstancias no estamos en libertad de substituir el criterio de la Junta por el nuestro anulando este decreto por haber sido promulgado sin autoridad toda vez que el propietario de una vaquería alega que su negocio actual le está dejando pérdida en vez de ganancia. Véanse *Luce & Cía.* v. *Junta de Salario Mínimo*, 62 D.P.R. 452; *Columbus & G. Ry. Co.* v. *Adm'r. of Wage and Hour Div.*, 126 F.2d 136 (C.C.A. 5th, 1942).

■ El decreto dispone que el valor de la leche suministrada por el patrono al empleado es parte del salario de éste, y que si se les suministra la leche ésta será rebajada del salario a razón de 10 centavos el litro en la zona primera y 8 centavos en la segunda, con excepción de los ordeñadores. En cuanto a estos últimos, tienen derecho a recibir del patrono un litro de leche al día, libre de costo, disponiéndose que de no suministrársele dicho litro diariamente, entonces se les pagará compensación adicional a los referidos tipos de 10 centavos y 8 centavos el litro.

El peticionario alega que esta disposición del decreto lo obliga a venderle leche a sus empleados a un precio menor que el que prevalece en el mercado, privándole de su propiedad sin el debido procedimiento de ley; y que la Junta

no tiene poder bajo la Ley núm. 8, de imponerle el deber al peticionario de suministrarle leche a sus empleados.

La prueba demostró que una gran mayoría de los trabajadores de las vaquerías que fueron investigadas recibían por lo menos, además de sus salarios, un litro de leche diario. Esta disposición del decreto tuvo la intención primordial por tanto de evitar una reducción pro tanto de los salarios apelando al ardid de venderle leche a los empleados a un costo mayor.

El decreto no obliga a los patronos a venderle leche a sus empleados. Sólo fija el costo de la misma para el caso de que por mutuo acuerdo lleguen a tal entendido. Y en cuanto a los ordeñadores, quienes de ordinario recibían gratuitamente un litro, continúa el decreto este privilegio. Pero aun aquí no se obliga a los patronos a venderle leche a los ordeñadores. De así elegirlo, pueden negarse a suministrarle la leche a los ordeñadores, caso en el cual el salario de éstos—que la Junta resolvió que en el pasado consistía en parte de esta leche—se aumenta en el costo de la leche a los otros empleados según lo fija el decreto. Nada encontramos en esta disposición del decreto que infrinja los derechos constitucionales del peticionario.

No es necesario que nos detengamos a examinar el punto de si la Legislatura confirió autoridad a la Junta para incluir esta disposición en su decreto. La mejor respuesta a esta contención es que el decreto de la Junta, promulgado el 5 de mayo de 1945, para empezar a regir a los sesenta días, fué ratificado por la Legislatura cuando ésta dispuso por la sección 2 de la Ley núm. 217, Leyes de Puerto Rico, 1945 (pág. 681), aprobada en 11 de mayo de 1945, que "Continuarán en vigor, mientras no se revoquen, suspendan, enmienden o alteren por la nueva Junta, todos los decretos mandatorios, reglamentos, resoluciones, acuerdos y órdenes dictados o aprobados por la actual Junta."

El decreto dispone que para la fase agrícola de la industria el salario mínimo será de veinte centavos la hora

en la zona primera y de dieciocho centavos la hora en la zona segunda. Para los empleados en la fase de pasterización y distribución el salario mínimo fijado en el decreto es de treinta centavos la hora en la zona primera y veinticinco centavos la hora en la zona segunda.

El negocio del peticionario radica en la primera zona. Alega que el fijar salarios diferentes en las dos zonas viola la disposición en bastardillas del inciso 2 de la sección 12 de la Ley núm. 8, según fué enmendada por la Ley núm. 217, que prescribe que ''la Junta podrá señalar. . . salarios mínimos diferentes para distintas zonas o regiones. . . cuando a su juicio tal diferenciación sea aconsejable debido a las condiciones existentes entre las zonas, regiones. . . *siempre que tal acción no conceda ventaja de competencia a otra u otras zonas, regiones. . .*''. (Bastardillas nuestras).

La mejor contestación para esta contención se encuentra en la resolución de la Junta declarando sin lugar la moción de reconsideración, que dispone en parte como sigue: ''La prueba demuestra que en la zona primera podrían pagarse los salarios en cantidad un poco más alta que en la zona segunda, donde son menores las oportunidades de mercado, buen precio de venta, acceso a la materia prima y facilidades de transporte. En la zona primera, según la realidad probada, se han venido pagando salarios más altos que en la otra. La clasificación es, por todo ello, razonable. Véase el caso de *Luce & Company* v. *Junta de Salario Mínimo*, 62 D.P.R. 452, 458, nota 3.''

Seguidamente el peticionario señala como error que después de concluídas las audiencias y antes de la promulgación del decreto, empleados de la Junta fueron destacados para llevar a efecto una investigación en la contabilidad de algunos de los agricultores que habían declarado en las audiencias. Se queja el peticionario de que la Junta al emitir su decreto tuvo que tomar en consideración estos informes, que nunca fueron presentados en evidencia y que el peticionario nunca tuvo oportunidad de refutar o explicar.

Si la Junta creyese necesario, después de terminada una audiencia pública y antes de emitirse un decreto, obtener mediante investigación alguna información que se propone tomar en consideración al decidir un caso, debe como cuestión de debido procedimiento hacer llegar a las **partes interesadas** los resultados de la investigación y concederles una oportunidad de contrainterrogar y de refutar antes de decidir el caso. *Mayagüez Sugar Co.* v. *Tribunal de Apelación de Contribuciones*, 60 D.P.R. 753, 767; *Casanovas & Cía.* v. *Soltero*, 61 D.P.R. 653; *Alemañy* v. *Comisión Industrial*, 63 D.P.R. 601.

De conformidad con nuestra resolución la Junta nos ha elevado los informes en cuestión, que de su faz demuestran que fueron rendidos al Presidente de la Junta después de terminadas las audiencias y antes de emitirse el decreto. Pero nada hay en el récord que indique que la Junta tomó estos informes en consideración para llegar a las conclusiones a que llegó. Al declarar sin lugar las mociones de reconsideración que suscitaron esta cuestión, la Junta afirmó que no había hecho uso de estos informes y que había descansado únicamente en la prueba aducida en la audiencia pública.

Creemos que el procedimiento seguido en este caso fué indeseable en extremo. Informe de investigaciones hechas después de terminada la audiencia y que las partes nunca conocieron, inevitablemente dan lugar a la sospecha de que la Junta los ha tomado en consideración para decidir el caso. Difícil es imaginarse qué otro propósito podría haber en tales investigaciones. Establecería mejores cimientos la Junta para una reputación de impartir justicia a todos por igual, si reabriera tales casos y trajera al récord tales investigaciones, concediendo el derecho de contrainterrogatorio y refutación. Sin embargo, como nada hay en el récord que controvierta la afirmación de la Junta de que al decidir este caso no tomó en consideración los informes de estas investigaciones posteriores, no podemos resolver que ha sido infringido el debido procedimiento.

600

Existen otros errores señalados que son tan triviales que no ameritan discusión. Los hemos examinado y carecen de méritos.

*El decreto de la Junta será confirmado.*

EN RECONSIDERACION
Julio 26, 1946

*Joaquín Velilla,* abogado del recurrente; *Ismael Soldevila,* abogado de la Junta recurrida.

EL JUEZ ASOCIADO SEÑOR CÓRDOVA emitió la opinión del tribunal.

El recurrente solicitó la reconsideración de nuestra sentencia de 10 de mayo de 1946, insistiendo en que el decreto de la Junta es nulo por haber ésta considerado evidencia que no se presentó en la audiencia pública, y llamando nuestra atención hacia el hecho de que, si bien como indicamos en nuestra opinión de 10 de mayo de 1946 el récord no demuestra que la Junta considerara dicha evidencia, el recurrente planteó dicha cuestión oportunamente ante la Junta, sin que se le diera oportunidad de presentar prueba sobre el extremo. En 21 de mayo dictamos resolución dejando en suspenso nuestra sentencia de 10 de mayo y devolviendo el caso a la Junta para que luego de oír la prueba pertinente

determinara si al emitir el decreto la Junta consideró informes que no habían sido presentados en evidencia.

La Junta celebró la vista y ha rendido su informe, y las partes han sido oídas en torno al mismo. Del informe y de la transcripción de la evidencia resulta que, luego de terminada la vista pública, el entonces Presidente de la Junta ordenó a ciertos empleados de la Junta investigaran los libros del recurrente y otros productores que declararon en la audiencia pública respecto a sus gastos de producción. Se llevó a cabo la investigación, y se rindieron los informes al entonces Presidente de la Junta, quien los leyó. Al Presidente de la Junta correspondió estudiar el caso y proponer a la Junta el decreto que fuere procedente, y así lo hizo, aprobándose su proposición con ligeras enmiendas cuya naturaleza no surge del récord.

El Presidente no informó nada a la Junta respecto a la investigación e informes hechos después de la audiencia pública, y los demás miembros de la Junta nunca se enteraron ni de la investigación ni de los informes. Los informes tienden a rebatir e impugnar los datos que sobre gastos de producción produjeron en evidencia el recurrente y otros productores en la audiencia pública.

Tenemos, pues, que uno de los miembros de la Junta, precisamente el miembro a quien la Junta encomendó el análisis del caso y la preparación del proyecto de decreto, recibió, después de haberse sometido el caso, evidencia secreta o confidencial que impugnaba la veracidad y el peso de la prueba presentada por los productores. No se dió a los productores oportunidad alguna de examinar, rebatir o explicar esa evidencia secreta. Pero nos dice el ex Presidente de la Junta, quien tuvo ante sí esa evidencia secreta, que no hizo uso de esa evidencia, que no la tomó en consideración, que no afectó su criterio. No dudamos de la sinceridad de las aseveraciones del ex Presidente, cuya declaración, por su franqueza, merece nuestro respeto. No obstante, no vemos cómo el ex Presidente pudo aquilatar la prueba de los productores, des-

pués de conocer la impugnación secreta de esa prueba hecha por empleados en quienes hemos de suponer tenía confianza, con la misma imparcialidad con que la habría aquilatado antes de leer el informe de sus empleados.

El hecho de que el resto de la Junta no conociera los informes confidenciales que su presidente conocía no tiene mayor importancia, ya que el estudio, el análisis y las recomendaciones que hiciera el presidente sirvieron de guía a la Junta en sus deliberaciones e indudablemente tuvieron un efecto decisivo en la actuación final de la Junta.

Ya hemos resuelto que la Junta debe actuar a base de la evidencia recibida en la audiencia pública, y que al efecto es esencial a la validez de sus decretos que sus miembros conozcan la evidencia y las contenciones de las partes. *Luce & Co.* v. *Junta Salario Mínimo,* 62 D.P.R. 452. ". . . de otro modo", dijimos entonces, "no puede decirse que ha existido la previa audiencia pública que exige la ley." Tampoco puede decirse que existe una verdadera audiencia pública cuando la Junta, o uno de sus miembros, solicita y obtiene evidencia secreta que destruya o modifique el efecto de la evidencia públicamente presentada, sin dar oportunidad a las partes interesadas para conocer, explicar o rebatir esa evidencia secreta. Véase *Ohio Bell Tel. Co.* v. *Commission,* 301 U.S. 292, 81 L. Ed. 1093; *United States* v. *Abilene & Southern Railway Company,* 265 U.S. 274, 68 L. Ed. 1016. Cf. *Norwegian Nitrogen Co.* v. *United States,* 288 U.S. 294, 77 L. Ed. 796. Como dijo el Juez Cardozo en el caso de *Ohio Bell Tel. Co.* v. *Commission,* supra, 301 U.S. 292, 304-05:

"A las comisiones reguladoras se les han conferido amplios poderes dentro de la esfera de los deberes que la ley les asigna. Aún en procedimientos cuasi judiciales su juicio experto e ilustrado exige y recibe de las cortes la deferencia apropiada cuando se ha formado con la debida sumisión a las restricciones constitucionales. *West Ohio Gas Co.* v. *Public Utilities Comm'n. (No. 1),* supra, pág. 70; *West Ohio Gas Co.* v. *Public Utilities Comm'n. (No. 2)* 294 U.S. 79; *Los Angeles Gas & Electric Corp.* v. *Railroad Commission,* 289 U.S. 287,

304. En verdad, mucho de lo que ellas hacen dentro del campo de la discreción administrativa está exento de supervisión si se han obedecido esas restricciones. Tanto más insistente es la necesidad, cuando se han conferido poderes tan libremente, de que la 'salvaguardia inexorable' (*St. Joseph Stock Yards Co.* v. *United States*, 298 U.S. 38, 73) de una vista justa y libre se sostenga en toda su integridad. *Morgan* v. *United States*, 298 U.S. 468, 480, 481; *Interstate Commerce Comm'n.* v. *Louisville & N. R. Co.*, supra. El derecho a una vista tal es uno de 'los rudimentos de un trato justo' (*Chicago, M. & St. P. Ry. Co.* v. *Polt*, 232 U.S. 165, 168) que a todo litigante garantiza la Enmienda Catorceava como requisito mínimo. *West Ohio Gas Co.* v. *Public Utilities Comm'n. (No. 1), (No. 2)*, supra; *Brinkerhoff-Faris Co.* v. *Hill*, 281 U.S. 673, 682. Cf. *Norwegian Nitrogen Co.* v. *United States*, supra. No puede transigirse, a base de la conveniencia o la utilidad, ni por el natural deseo de obviar una demora molestosa, cuando ese requisito mínimo ha sido olvidado o pasado por alto.''

El requisito de la audiencia pública, que en primera instancia cumplió la Junta en el caso de autos, fué violado cuando posteriormente recibió el presidente de la Junta evidencia secreta de un carácter tal que no puede haber dejado de afectar su criterio. Al igual que en el caso de *Luce & Co.*, supra, esa violación del requisito de audiencia pública que fija el estatuto conlleva la nulidad del decreto.

*Por los fundamentos expuestos, debe dejarse sin efecto nuestra sentencia de 10 de mayo de 1946 y en su lugar dictarse otra anulando el Decreto Núm. 10' de la Junta de Salario Mínimo y devolviendo el caso a la Junta para ulteriores procedimientos no inconsistentes con esta opinión.*