Antonio Roig, Sucrs., S. en C., peticionaria, *v.* Junta Azu-
carera de Puerto Rico y Asociación de Colonos de
Yabucoa, recurridas.

Número 1.

*Sometido:* 2 de febrero de 1953. *Resuelto:* 5 de noviembre de 1954.

*James R. Beverley, R. Castro Fernández* y *Francisco Castro Amy,* abogados de la peticionaria; *A. Torres Braschi* y *José E. Guzmán,* abogados de la Junta recurrida; *F. Fernández Cuyar,* abogado de la Asociación de Colonos de Yabucoa recurrida.

EL JUEZ PRESIDENTE SEÑOR SNYDER emitió la opinión del Tribunal.

La cuestión planteada en este caso es la validez del art. 6(c) de la Ley núm. 426, Leyes de Puerto Rico, 1951 (pág. 1139), conocida como la "Ley Azucarera de Puerto Rico",

que dispone que "En los casos en que la central haya venido usando vías portátiles para el arrastre de las cañas de un colono, la central vendrá obligada a suplir al colono, sin costo alguno para éste, dichas vías portátiles y material rodante necesarios, y asimismo vendrá obligada a pagar al colono cinco centavos (5¢) por tonelada de caña por concepto de arrimo."

La Central Roig, propiedad de Antonio Roig, Sucrs., S. en C., en adelante llamada Roig, muele las cañas de cierto número de colonos. Estos colonos arrastran y arriman sus cañas a los desvíos designados por la central en la forma descrita en el art. 6 (c); v.g., sobre vías portátiles y vagones de caña propiedad de Roig. Sin embargo, ésta se negó a pagarles los cinco centavos que exige el art. 6 (c) por tonelada de caña para cubrir tales gastos de arrimo. Por el contrario, les cobró diez centavos por tonelada por el uso de sus vías portátiles.

La Junta Azucarera de Puerto Rico expidió una orden requiriendo a Roig que mostrara causas por qué no cumplía con el art. 6 (c). Celebrada una vista en la que Roig argumentó que el art. 6 (c) era inconstitucional, el 13 de junio de 1952 la Junta dictó una resolución requiriendo a Roig que (1) devolviera a sus colonos cualquier cantidad de dinero cobrada por ella por el uso de las vías portátiles; (2) supliera a sus colonos, sin costo alguno para éstos, las vías portátiles y el material rodante necesario; (3) pagara a sus colonos cinco centavos por cada tonelada de caña arrimada hasta la fecha mediante el uso de vías portátiles; y (4) pagara a sus colonos cinco centavos por cada tonelada de caña que en la misma forma arrimaran sus colonos desde dicha fecha en adelante. (¹) A tenor con el art. 33 de la Ley núm. 426, Roig radicó ante este Tribunal una solicitud de revisión de la orden de la Junta.

La peticionaria sostiene que la rama de su negocio conocida como Central Roig se dedica exclusivamente a la

---

(¹) Suponemos que los términos de esta orden se aplican desde la fecha en que la Ley núm. 426 entró en vigor.

fase industrial de la industria azucarera, según aquélla se distingue de la agrícola; y que constituye una infracción del debido procedimiento de ley federal y local exigirle (*a*) que proporcione a sus colonos, que pertenecen a la fase agrícola de la industria, vías portátiles y vagones pequeños libre de costo, y (*b*) que pague a dichos colonos cinco centavos por tonelada de caña para gastos de arrimo, como dispone el art. 6(*c*).(²)

Roig aparentemente cree que en el negocio de azúcar existen dos divisiones impenetrables—la industrial y la agrícola—que están completamente separadas una de otra y que no pueden ser tratadas conjuntamente por la Asamblea Legislativa como una sola industria a los fines de reglamentación. No podemos ver base para esta posición. Como más adelante se indicará, tanto la legislación federal como la estatal que regulan la industria azucarera como una unidad han sido declaradas válidas. La Ley núm. 426 igualmente regula toda la industria en Puerto Rico, incluyendo tanto la fase agrícola como la industrial. Nada impropio o nulo encontramos en esto.

Roig cita un número de casos en apoyo de la proposición de que la fase agrícola y la industrial de la industria azucarera deben ser tratadas separadamente. Pero esos casos no sostienen esta teoría.(³) Casi todos ellos surgieron bajo es-

---

(²) La peticionaria se dedica en realidad tanto a la molienda como a la agricultura. Sin embargo, a los fines de la contabilidad y a otros, llama a una "división" de su negocio, Central Roig, la que se dedica exclusivamente a la molienda de cañas. Dejamos a un lado la cuestión de si, bajo estas circunstancias, la peticionaria tiene derecho a alegar que la industria azucarera se divide en dos partes—la agrícola y la industrial—y que ella se dedica exclusivamente a la fase industrial.

(³) Roig cita casos tales como *Allen* v. *Smith*, 173 U. S. 389, 398; *Bowie* v. *González*, 117 F.2d 11 (C.A. 1, 1941); *Vives* v. *Serrallés*, 145 F.2d 552 (C.A. 1, 1944); *Stuart* v. *Kleck*, 129 F.2d 400 (C.A. 9, 1942); *Sancho* v. *Bowie*, 93 F.2d 323 (C.A. 1, 1937); *Central Coloso* v. *Tribl. Contribuciones*, 70 D.P.R. 65; *Luce & Co.* v. *Junta Salario Mínimo*, 62 D.P.R. 452, confirmado en 155 F.2d 983 (C.A. 1, 1946). Aunque no son aquí aplicables, algunos de ellos contienen expresiones que vierten luz sobre la naturaleza de la industria azucarera y con ese fin los citamos más adelante.

tatutos que por definición crearon las dos categorías diferentes de la fase agrícola y de la industrial de la industria azucarera para fines contributivos y de salarios. Bajo estos estatutos se pagaban salarios y contribuciones diferentes, dependiendo de si determinada actividad era agrícola o industrial, según se definía en los estatutos. Pero la línea que divide las fases agrícola e industrial del negocio del azúcar en estos estatutos no es sagrada y no aparece en la Ley núm. 426. Por consiguiente, los casos resueltos bajo estatutos que fijaron una diferencia entre estas dos fases de la industria, para fines contributivos y de salarios, no son de aplicación aquí. (⁴)

▮▮▮ La principal contención de la peticionaria es que el art. 6(c) viola el debido procedimiento federal y la cláusula del debido procedimiento—sección 7 del Artículo II—de la Constitución del Estado Libre Asociado. (⁵) Roig descansa

---

(⁴) Rechazamos una contención similar en *Central Coloso* v. *Tribl. Contribuciones*, *supra*, que envolvía la cuestión de si los vagones de ferrocarril que se usan para transportar caña a una central estaban exentos del pago de arbitrios a tenor con un estatuto que exenta el equipo esencial para el funcionamiento de una planta industrial. Resolvimos que bajo este estatuto el proceso industrial no incluye la transportación de las materias primas necesarias para dicho proceso. Dijimos a la pág. 68: "La peticionaria también descansa en cierta reglamentación de la Comisión de Servicio Público en cuanto a la transportación de cañas y en *Calaf* v. *González*, 127 F.2d 934 (C.C.A. 1, 1942), que resuelve que los empleados de una central que se dedican a la transportación de cañas están cubiertos por la Ley sobre Normas Razonables del Trabajo. Pero la reglamentación de la peticionaria como empresa de servicio público y la aplicación de una ley reparadora en cuanto a salarios, que debe interpretarse liberalmente, nada tienen que ver con una ley de exención contributiva, que claramente no cubre la transportación de materia prima y que de cualquier modo debe interpretarse restrictivamente. Y *cf. Sancho* v. *Bowie*, 93 F.2d 323, 326 (C.C.A. 1, 1937)".

(⁵) Véanse *Mora* v. *Mejías*, 206 F.2d 377, 382 (C.A. 1, 1953); *Pueblo* v. *Figueroa*, ante pág. 188. *Cf. Note, State Views on Economic Due Process: 1937–1953*, 53 Col.L.Rev. 827; *Note, Constitutional Law: Substantive Due Process: Minimum Price Laws*, 42 Calif. L.Rev. 172, que discuten casos estatales recientes que declaran nulos, bajo la cláusula del debido procedimiento de constituciones estatales, estatutos sobre reglamentación eco-

en casos que resuelven que se viola el debido procedimiento, si se requiere como empresas de servicio público (1) que las compañías de electricidad proporcionen bombillas a los consumidores; (2) que las compañías de trenes instalen y mantengan balanzas o ramales cortos; y (3) que los ferrocarriles presten sus facilidades a otra compañía. Algunos de los casos que cita se refieren a la cuestión de si las comisiones de servicio público pueden reglamentar o prohibir a empresas de servicio público cosas tales como la venta de accesorios y el cobro de reparaciones y de instalación de alambres. (6)

Nuevamente los casos citados por Roig nada tienen que ver con el problema ante nos. Hay un número de razones por las que estos casos son distinguibles. Pero la diferencia más importante entre dichos casos y la situación en el que ahora nos ocupa es que la Ley núm. 426 reglamenta la industria del azúcar en Puerto Rico. Por consiguiente, la cuestión de si sus disposiciones infringen el debido procedimiento de ley debe determinarse a la luz de las condiciones y pro-

---

nómica. Estos casos estatales—y casos similares citados en el alegato de Eastern Sugar Associates en *Colonos de Caña de Santa Juana* v. *Junta Azucarera*, Núm. 6, resuelto en el día de hoy—son inaplicables aquí y en todo caso no nos obligan.

La peticionaria tilda a veces el art. 6(c) de la Ley núm. 426 como que le toma su propiedad sin justa compensación. Véase la Sección 9 del Artículo II de la Constitución del Estado Libre Asociado.

(6) A continuación los casos y otras autoridades citadas por Roig sobre este punto: *In Re Opinion of the Justices*, 14 N.E.2d 392 (Mass., 1938); *Annotation*, 115 A.L.R. 1162; *Great Northern Ry. Co.* v. *Minnesota*, 238 U. S. 340; *Great Northern Ry. Co.* v. *Cahill*, 253 U. S. 71; *Northern Pac. Ry. Co.* v. *Railroad Commission*, 108 Pac. 938 (Wash., 1910); *Consumers' Sanitary C. & B. Stores* v. *Illinois Com. Com'n.*, 348 Ill. 615, 181 N.E. 411 (Ill., 1932); *Public Utilities Comm.* v. *Commonwealth Edison Co.*, P.U.R. 1918 F 109 (Ill., 1918); *Pub. Util. Comm.* v. *Henderson County Pub. Serv. Co.*, P.U.R. 1920 C 381 (Ill., 1920); *Claggett* v. *Eastern Shore Gas & E. Co.*, P.U.R. 1920 C 501 (Md., 1920); *Just* v. *Consolidated Gas Co.*, P.U.R. 1918 C 390 (N.Y., 1918); *Capital Gas & Electric Co.* v. *Boynton*, 22 P.2d 958 (Kans., 1933); *Gamble-Robinson F. Co.* v. *Chicago, M. & St. P. Ry. Co.*, P.U.R. 1927 D 320 (S.D., 1927); *Louisville &c. R.R. Co.* v. *Stock Yards Co.*, 212 U. S. 132; *Southern Ry. Co.* v. *Shealy*, 18 F.2d 784 (Dist. Ct., S.C., 1927).

blemas de dicho negocio específico. *Nebbia* v. *New York*, 291 U. S. 502, 525.(⁷)

Roig afirma en forma elíptica que se infringe el debido procedimiento si se le exige (*a*) que permita a sus colonos usar sus facilidades ferroviarias libre de costo, y (*b*) que pague a los colonos por arrimar sus propias cañas. Pero el art. 6 (*c*), que contiene estos requisitos, no puede examinarse aisladamente. Debe interpretarse junto a las otras disposiciones de la Ley núm. 426 frente a la raigambre de la industria azucarera en Puerto Rico.

Ninguna industria ha sido más extensamente reglamentada en interés del público que el negocio de azúcar en Puerto Rico. La Ley núm. 112, Leyes de Puerto Rico, 1937 (pág. 271), estableció normas y participaciones uniformes para la molienda de caña de azúcar por las centrales para los colonos. La validez de esta Ley bajo la cláusula del debido procedimiento de ley en tanto en cuanto se aplicaba al operador de una central específica fué infructuosamente impugnada en *Vidal* v. *Fernández*, 104 F.2d 606 (C.A. 1, 1939) cert. denegado, 308 U. S. 602.

La Ley núm. 221, Leyes de Puerto Rico, 1942 ((1) pág. 1177), abandonó el método empleado en la Ley núm. 112 proveyendo participaciones uniformes para la molienda de las cañas de los colonos.(⁸) Por el contrario, bajo la Ley núm.

---

(⁷) "La Enmienda Quinta, en el campo de la actividad federal, y la Décimocuarta, en cuanto a la acción estatal, no prohiben la reglamentación gubernamental para el bienestar público. Meramente condicionan el ejercicio del poder admitido, al garantizar que el fin será logrado mediante métodos consistentes con el debido procedimiento. Y la garantía del debido procedimiento, como a menudo se ha dicho, sólo exige que la ley no sea irrazonable, arbitraria o caprichosa, y que el medio elegido tenga una relación real y sustancial con el objetivo que se persigue. *Sucede que un reglamento válido para cierta clase de negocio, o bajo dadas circunstancias, puede no serlo para otra clase, o para el mismo negocio bajo distintas circunstancias, porque la razonabilidad de cada reglamento depende de los hechos pertinentes*." *Nebbia* v. *New York*, supra, pág. 525. (Bastardillas nuestras).

(⁸) "Caña de colono" es la caña cultivada por agricultores independientes, en contraste con la "caña de administración" que el propio molino cultiva.

221 se declaró a las centrales empresas de servicio público y se le exigió a la Comisión de Servicio Público que fijara a cada central aquella tarifa individual para la molienda de cañas de colonos que proporcionara a cada central un beneficio razonable sobre el valor justo de sus bienes dedicados al servicio público. Sostuvimos la validez de la Ley núm. 221 en tanto en cuanto exigía a una central que moliera solamente sus propias cañas que obtuviera una "franquicia" de la Comisión de Servicio Público. *Pueblo* v. *A. Roig, Sucrs.*, 63 D.P.R. 18. Al confirmar esta sentencia la Corte de Apelaciones interpretó el término "franquicia" bajo dichas circunstancias como una "licencia". *Roig* v. *People of Puerto Rico*, 147 F.2d 87 (C.A. 1, 1945). *Cf.* Duke, *Comment*, 30 Cornell L. Q. 243.

Después de nueve años de experiencia bajo la Ley núm. 221, la Asamblea Legislativa realizó una vez más un importante cambio de política en cuanto a la reglamentación de la industria azucarera en Puerto Rico. Derogó la Ley núm. 221.(⁹) Y la sustituyó con la Ley núm. 426 de 1951. Bajo esta última ley ya no se consideraba a las centrales como empresas de servicio público con tarifas a ser cobradas individualmente por cada central según las determinara la Comisión de Servicio Público. La Ley núm. 426 en sustancia retornó al método de participaciones uniformes que se encuen-

---

(⁹) Algunos de los problemas presentados por la Ley núm. 221 se discuten en *Cía. Azucarera Toa* v. *Com. Serv. Público*, 71 D.P.R. 212; *Godreau & Co.* v. *Com. Servicio Público*, 71 D.P.R. 649. Estos casos no declararon nula disposición alguna de la Ley núm. 221. En el caso de *Toa* resolvimos que bajo la Ley núm. 221 la Comisión de Servicio Público no podía fijar tarifas provisionales a ser cobradas por un molino como empresa pública a no ser que hubiese pendiente un procedimiento para fijar una tarifa permanente. En el caso de *Godreau* resolvimos que ciertas resoluciones de la Comisión de Servicio Público en cuanto a servicios y tarifas bajo la Ley núm. 221 eran nulas no sólo por la razón expresada en el caso de *Toa* sino también por no haberse celebrado debidamente audiencias sobre las mismas. En el caso de *Godreau* desestimamos también la apelación por falta de jurisdicción con respecto a ciertos Reglamentos Generales de la Comisión de Servicio Público.

En relación con otro ángulo de la Ley núm. 221, véase *Pueblo* v. *Eastern Sugar Associates*, 72 D.P.R. 587.

tran en la Ley núm. 112 de 1937, si bien con varios cambios, más flexibilidad y más amplios poderes para la Junta Azucarera. Véase *Molini v. Soc. Mario Mercado e Hijos*, 73 D.P.R. 937, 946. Para discusiones con respecto a las disposiciones de las Leyes núms. 112, 221 y 426, véanse García Martínez, *Local Regulation of the Sugar Industry in Puerto Rico*, XXII Rev.Jur. U.P.R. 385; Novas, *La Central Azucarera como Empresa de Servicio Público—Apuntes sobre la Constitucionalidad de la Ley núm. 221 de 1942*, 8 Revista de Derecho, Legislación y Jurisprudencia del Colegio de Abogados de Puerto Rico 342; José Acosta Velarde, *Consideraciones sobre la Ley Azucarera de Puerto Rico*, Revista Del Café, septiembre 1953, pág. 13.

En adición a los anteriores estatutos locales sobre reglamentación, la ley federal fijó controles sobre producción y mercadeo. La Ley Jones-Costigan de 1934, 48 Stat. 670; la Ley Azucarera de 1937, 50 Stat. 903; la Ley Azucarera de 1948, según fué enmendada, 61 Stat. 922, 7 U.S.C.A. secs. 1100–60. La Corte Suprema de los Estados Unidos ha resuelto que las cuotas fijadas por el Secretario de Agricultura bajo la Ley Azucarera Federal de 1948 para el mercadeo en los Estados Unidos continentales del azúcar refinada de Puerto Rico no infringían el debido procedimiento de ley. *Secretary of Agriculture v. Central Roig Co.*, 338 U. S. 604.[10]

La abarcadora reglamentación de la industria azucarera que señalamos se ha debido a una combinación de factores. En primer lugar y antes que nada, la industria azucarera es la espina dorsal de la economía de Puerto Rico. Es ". . . el nervio vital de nuestra economía insular." Ley núm. 396, Leyes de Puerto Rico, 1950 (pág. 943), Exposición de Motivos; Perloff, *Puerto Rico's Economic Future* 67–9, 88–91,

---

[10] Ciertas leyes federales y locales han reglamentado también salarios, horas y condiciones de trabajo en la industria azucarera. *Bowie v. González*, supra; *Vives v. Serrallés*, supra; *Luce & Co. v. Junta Salario Mínimo*, supra; *Peña v. Eastern Sugar Associates* (75 D.P.R. 304 (1953); 10 de diciembre de 1953; 15 de marzo de 1954), también informado en 24 Labor Cases 85,254 y 25 Labor Cases 86,103.

278; *People of Puerto Rico* v. *Eastern Sugar Associates*, 156
F.2d 316, 325 (C.A. 1, 1946) ; *Roig* v. *People of Puerto Rico*,
supra, pág. 90. Es obvio que la Asamblea Legislativa es-
tuvo por lo tanto justificada al reglamentarla en el interés
.público—ya las centrales sean o no tratadas o consideradas
como empresas tradicionales de servicio público. *Nebbia* v.
*New York*, supra, pp. 531–4.([11]) En segundo lugar, la te-
nencia y cultivo de tierras en Puerto Rico—comunidad den-
samente poblada con una economía mayormente agrícola—es
de suma importancia para el bienestar público. Véanse Ex-
posición de Motivos, Ley núm. 26, Leyes de Puerto Rico, 1941
( (1) pág. 389), conocida como la Ley de Tierras de Puerto
Rico; art. 11(*a*) de la Ley núm. 26, según fué adicionado
por la Ley núm. 8 del 20 de noviembre de 1942 ( (2) pág.
29) ; *Pueblo* v. *Rubert Hermanos, Inc.*, 53 D.P.R. 779, 791–2,
y el mismo caso en 309 U. S. 543, 548; *People of Puerto Rico*
v. *Eastern Sugar Associates*, supra; *Roig* v. *People of Puerto
Rico*, supra, pág. 90; Koenig, *A Comprehensive Agricultural
Program for Puerto Rico*, 31–42. En tercer lugar, era razo-
nable fijar por ley los precios mínimos que deberían las cen-
trales pagar por las cañas de colonos debido a que (1) la caña

---

([11]) La Ley núm. 221 declaró a las centrales empresas de servicio pú-
blico. La Ley núm. 426 eliminó este concepto. Pero el hecho de que las
centrales no sean ya empresas de servicio público como tal no invalida las
disposiciones de la Ley núm. 426 sobre el pago mínimo de las centrales a
los colonos por su caña. *Nebbia* v. *New York*, supra, págs. 531–4, rechazo
la contención de que las leyes sobre control de precios son válidas sólo para
las empresas tradicionales de servicio público. El caso de *Nebbia* también
hace claro que la frase "afectados de un interés público" no se limita a
ciertos tipos de negocios. Dice a la pág. 534: ". . . si uno establece un
negocio cuya reglamentación exige el interés público, uno debe saber que
dicha reglamentación vendrá." Y a la pág. 536: "Es claro que no hay
ninguna clase o categoría cerrada de negocios afectados de un interés pú-
blico, y la función de los tribunales en la aplicación de las Enmiendas
Quinta y Décimocuarta es determinar en cada caso si las circunstancias
vindican la reglamentación impugnada como un ejercicio razonable de auto-
ridad gubernamental o la condenan como arbitraria o discriminatoria.
*Wolff Packing Co.* v. *Industrial Court*, 262 U. S. 522, 535. La frase 'afec-
tado de interés público' puede, en la vida de las cosas, sólo significar que
una industria, por motivos justificados, está sujeta a control para el bien-
estar del público." Véase Rottschaefer, *Constitucional Law*, pág. 487.

es un producto perecedero que debe molerse poco después de cortarse, y (2) que los colonos usualmente dependen de la central más cercana a la cual deben llevarse sus cañas para molienda. Véase *Godreau & Co.* v. *Com. Servicio Público*, supra, págs. 649, 659, en donde hablamos de los esfuerzos de la Asamblea Legislativa en la Ley núm. 221 para ". . . asegurar a los colonos un trato justo, que se hace necesario por la ventajosa posición de las compañías . . .".[12] Tanto se ha dicho sobre todas estas circunstancias en el negocio de azúcar que abundar sobre ellas equivaldría a enfrascarnos en disquisiciones que rayarían en ostentación. *Vidal* v. *Fernández,* supra, pág. 609; *Roig* v. *People of Puerto Rico,* supra, pág. 90; véanse *Bowie* v. *González,* supra, pág. 14; *Secretary of Agriculture* v. *Central Roig Co.,* supra, págs. 605–6, 617–8.[13]

[12] Un abogado que representa una empresa que opera una central ha descrito la situación en esta forma: "Como consecuencia de la peculiar naturaleza de la caña de azúcar—su fácil destructibilidad *(perishability)*— se hace necesario su molienda dentro del término más corto posible después del corte, por lo que el agricultor viene prácticamente obligado a moler sus cañas en el molino más cercano a su plantación. Por otro lado, la caña no puede ser transportada económicamente por largas distancias, razón por la cual *se ha establecido la costumbre en la industria de que la Central paga al colono cierta cantidad por tonelada de caña, por concepto de arrastre y arrimo,* o sea, el gasto en transportar la caña desde la plantación hasta el patio del molino. La combinación de los dos factores señalados (destructibilidad y alto coste de transporte) combinados constituyen la causa básica por la cual el molino ejerce en realidad un verdadero monopolio en su localidad." Novas, supra, págs. 369–70. (Bastardillas nuestras.) Debe tenerse en cuenta que durante la zafra de 1954 sólo funcionaban 33 centrales, que molían la caña de miles de colonos. Informe de la Junta Azucarera, de fecha 9 de septiembre de 1954, *Caña Molida, Azúcar 96° Producida,* y *Participación del Colono, Zafra de 1954.*

[13] Al aprobar la Ley núm. 426 de 1951 la Asamblea Legislativa aparentemente actuó basada en la premisa de que la relación entre los colonos y las centrales no ha cambiado en lo básico. No podemos decir que la Asamblea Legislativa fué arbitraria y totalmente irrazonable al llegar a esa conclusión en esta debatible cuestión. El lenguaje de la Corte Suprema en *Secretary of Agriculture* v. *Central Roig Co.,* supra, es pertinente sobre este punto. Dijo la Corte a la pág. 606, escolio 1: "En el curso de esta opinión todas las expresiones de carácter económico deben atribuirse a aquéllos con autoridad para emitir tales juicios económicos—al Congreso y el Secretario de Agricultura—y no deben considerarse como el criterio independiente de la Corte. No tenemos derecho a emitir criterios econó-

No podemos aceptar el criterio de que debemos enfocar nuestra atención únicamente hacia el art. 6(c) y declararlo inconstitucional porque dicho artículo exige a Roig que proporcione a sus colonos vías portátiles, libre de costo, y les pague cinco centavos por tonelada de caña como gastos de arrimo. "Una sección de un estatuto no se lee aisladamente sino junta con las otras secciones de la Ley con el fin de determinar su verdadero significado y propósito." *Pueblo* v. *Mantilla*, 71 D.P.R. 36, 42, y casos citados; *Orta* v. *Registrador*, 60 D.P.R. 789, 793; *Vázquez* v. *Junta de Síndicos*, 59 D.P.R. 145, 149; *People of Puerto Rico* v. *Eastern Sugar Associates*, supra, pág. 323. El art. 6(c) debe leerse en el contexto de la Ley núm. 426 como una unidad y teniendo en cuenta las circunstancias antes expuestas con respecto a la industria azucarera en Puerto Rico.

El art. 5 de la Ley núm. 426 establece una participación mínima del colono en el azúcar y mieles obtenidas de sus cañas. El art. 6 reconoce que se emplean diferentes métodos de arrastre y arrimo de las cañas de los colonos a la Central y especifica la forma de pagar los gastos en relación con cada método. El art. 7 trata de la liquidación de la participación del colono, ya sea en azúcares o en efectivo.([14]) En

micos; estamos limitados a pasar sobre el derecho del Congreso y del Secretario a actuar a base de criterios económicos que no carecen enteramente de base." El lenguaje empleado en el caso de *Day-Brite Lighting, Inc.* v. *Missouri*, 342 U. S. 421, 425, es al mismo efecto: "Pero si es que nuestros casos recientes significan algo, los mismos dejan a la decisión legislativa la resolución de cuestiones debatibles con respecto a asuntos de negocios, económicos y sociales."

El párrafo anterior dispone de la afirmación de los peticionarios en el caso de *Eastern Sugar Associates* v. *Junta Azucarera*, núm. 2, resuelto en el día de hoy, al efecto de que ellos no admiten que la relación económica entre las centrales y los colonos se describe correctamente en el caso de *Vidal* v. *Fernández*, supra. Dicha cuestión muy bien puede ser una debatible. Pero el debate debe resolverse, bajo los casos de *Central Roig Co.* y *Day-Brite*, por la Asamblea Legislativa y no por nosotros. Podemos anular la conclusión legislativa solamente si ésta es arbitraria y totalmente irrazonable. No encontramos que lo sea en este caso.

([14]) Para un examen más minucioso de los arts. 5, 6 y 7, véanse los casos de *Eastern Sugar Associates* v. *Junta Azucarera*, núm. 2, *Eastern*

este caso Roig no se queja de ninguna de estas disposiciones con excepción del art. 6(c), que determina la forma de pagar por el arrimo de las cañas cuando la central opta por emplear el método que en dicho artículo se describe. Pero el art. 6(c) es una parte integrante de un estatuto abarcador que—similar a estatutos tales como las Leyes núms. 112 y 221 en el pasado—se ocupa de reglamentar sobre una base global la compensación a la cual tienen derecho los colonos. En términos prácticos, suplementa al art. 5 al prescribir alguna compensación adicional para los colonos.[15] En verdad la palabra "compensar" aparece con frecuencia en todo el art. 6. En adición a que seguía la costumbre y la tradición, bien podría ser que la Asamblea Legislativa decidiera incorporar en el art. 6 los diferentes métodos de compensar a los colonos por los gastos de arrastre y arrimo más bien que aumentar correspondientemente la participación de aquéllos bajo el art. 5 a fin de sufragar tales gastos por lo menos por dos razones: (1) los diversos métodos y costos de arrastre y arrimo que harían difícil establecer un promedio razonable para ello; (2) la falta de capital o justificación económica en algunos casos para que los colonos arrastrasen y arrimasen sus propias cañas.[16] De cualquier modo, la compensación del colono por sus cañas no se fija exclusivamente por el art. 5. Por el contrario, su compensación se establece por los términos de los arts. 5, 6 y 7, leídos conjun-

*Sugar Associates* v. *Junta Azucarera*, núm. 3, y *Colonos de Caña de Santa Juana* v. *Junta Azucarera*, núm. 6, resueltos en el día de hoy.

[15] *Cf.* la manifestación hallada en el caso de *Bowie* v. *González*, supra, pág. 14, al efecto de que ". . . *como compensación por arrastre y arrimo de la caña de los colonos* y por extraerle el azúcar, los apelantes [Eastern Sugar Associates] reciben aproximadamente 35 por ciento del azúcar crudo de la centrífuga producido de tales cañas." (Bastardillas y corchetes nuestros.) Véase también, *González* v. *Bowie*, 123 F.2d 387, 389 (C.A. 1, 1941).

[16] Rechazamos por impertinente, bajo las circunstancias, el argumento interpuesto en el caso de *Eastern Sugar Associates* v. *Junta Azucarera*, núm. 2, y en el de *Eastern Sugar Associates* v. *Junta Azucarera*, núm. 7, resueltos en el día de hoy, al efecto de que el art. 6 es inválido porque provee compensación y servicios a los colonos que no tienen relación alguna con el precio por unidad ya sea del azúcar o ya de los servicios de la central.

tamente.([17]) Ante la Junta no se ofreció testimonio alguno para probar y aquí no se hace alegación alguna al efecto de que Roig vendrá obligada a operar su central con pérdidas o ganancia insuficiente bajo los arts. 5, 6, y 7 y las otras disposiciones de la Ley núm. 426. Bajo estas circunstancias, en vista de la autoridad que tiene la Asamblea Legislativa para fijar la compensación mínima a los colonos debido a la importancia de tal medida en la economía de Puerto Rico y debido a las desventajas con que trabajan los colonos, véase *Vidal* v. *Fernández*, supra, pág. 609, no encontramos base para aislar el art. 6(*c*), que dispone una parte comparativamente pequeña de la compensación que reciben los colonos, y anularlo por el fundamento de que viola el debido procedimiento de ley. "Sería una intromisión singular del poder judicial en el proceso legislativo inyectar restricciones a la formulación de tal política económica provenientes de esas arraigadas nociones de justicia que expresa la Cláusula del Debido Procedimiento." *Secretary of Agriculture* v. *Central Roig Co.*, supra, pág. 617. Véanse, por analogía, *B. & O. R. Co.* v. *United States*, 345 U. S. 146; *California Auto Assn.* v. *Maloney*, 341 U. S. 105; *Alabama Comm'n* v. *Southern R. Co.*, 341 U. S. 341, opinión concurrente del Juez Frankfurter a las págs. 352–3; *Day-Brite Lighting, Inc.* v. *Missouri*, supra; *Atchison R. Co.* v. *Pub. Util. Comm'n.*, 346 U. S. 346; *Sunshine Coal Co.* v. *Adkins*, 310 U. S. 381; *United States* v. *Rock Royal Co.-op.*, 307 U. S. 533; *Escudero* v. *Junta Salario Mínimo*, 66 D.P.R. 594, 596, opinión dejada sin efecto por otros fundamentos, 66 D.P.R. 600; *Ponce Candy Industries* v. *Corte*, 69 D.P.R. 417, 422 *et seq.*; *Luce & Co.* v. *Junta Salario Mínimo*, supra, pág. 458; *Caguas Bus Line* v. *Sierra*,

---

([17]) Por los motivos aquí expuestos, no procede la contención de que la frase "en pago de éstas" del art. 5 demuestra que dicho artículo provee para toda la compensación a que tiene derecho el colono. Por las mismas razones, el art. 38 de la Ley núm. 426 no cambia nuestro criterio de que los artículos 5, 6 y 7 deben interpretarse conjuntamente. El art. 38 es la cláusula usual de salvedad que entraría en juego sólo si parte de la Ley núm. 426 fuere declarada inconstitucional, y nada tiene que ver con el problema ante nos. Véase *Tugwell, Gobernador* v. *Corte*, 64 D.P.R. 220.

*Comisionado,* 73 D.P.R. 743, 750; *Hilton Hotels* v. *Junta Salario Mínimo,* 74 D.P.R. 670, 713–19; *Condado Beach Hotel* v. *Junta Salario Mínimo,* 74 D.P.R. 724, 729; 66 Harv.L.Rev. 89, 132, escolio 251.([18])

Creemos que del récord ante nos el art. 6(c) es válido, independientemente de consideraciones históricas. Sin embargo, su validez, al leerse conjuntamente con el resto de la Ley núm. 426, se refuerza por el hecho de que, con algunas excepciones de comparativa menor importancia, las Leyes núms. 112, 221 y 426, en términos generales, han seguido la costumbre y el patrón histórico de la industria azucarera en Puerto Rico al fijar la compensación, incluyendo gastos de arrastre y arrimo, que las centrales han sido obligadas a pagar a sus colonos. *Cf.* el art. 7 de la Ley núm. 112 de 1937, según fué enmendado por la Ley núm. 213, Leyes de Puerto Rico, 1938 ((1) pág. 428), y según fué interpretado en *Calaf* v. *González,* 127 F.2d 934, 937 (C.A. 1, 1942); art. 7 del Re-

---

([18]) El lenguaje usado en el caso de *Day-Brite Lighting, Inc.* v. *Missouri,* supra, es de aplicación aquí. La Corte dijo a la pág. 423: "El argumento sobre la libertad de contratación que se nos presenta es una reminiscencia de la filosofía del caso de *Lochner* v. *New York,* 198 U. S. 45, que anuló una ley de Nueva York que fijaba horas máximas de trabajo en las panaderías; del caso de *Coppage* v. *Kansas,* 236 U. S. 1, que anuló un estatuto de Kansas proscribiendo contratos en que el obrero se comprometía a no hacerse miembro de una unión; del caso de *Adkins* v. *Children's Hospital,* 261 U. S. 525, que declaró inconstitucional un estatuto federal que fijaba normas mínimas de trabajo para mujeres en el Distrito de Columbia, y otros de igual época. Nuestras recientes decisiones prescriben claramente que esta Corte no funciona como una superlegislatura para pesar la sabiduría de la legislación o para decidir si la política que expresa está en pugna con el bienestar público. El poder legislativo tiene sus limitaciones, según resuelve el caso de *Tot* v. *United States,* 319 U. S. 463. Pero las asambleas legislativas estatales tienen autoridad constitucional para experimentar con nuevas técnicas; tienen derecho a sus propias normas de bienestar público; pueden dentro de amplísimas limitaciones controlar las prácticas en el campo obrero-patronal, mientras las prohibiciones constitucionales específicas no sean infringidas y mientras se eviten conflictos con las leyes federales válidas y predominantes. Esta es la esencia de las decisiones en los casos de *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379; *Nebbia* v. *New York,* 291 U. S. 502: *Olsen* v. *Nebraska,* 313 U. S. 236; *Lincoln Union* v. *Northwestern Co.,* 335 U. S. 525; y *California Auto Assn.* v. *Maloney,* 341 U. S. 105."

glamento General de la Comisión de Servicio Público bajo la Ley núm. 221 de 1942, según fué mencionado en *Godreau & Co. v. Com. Servicio Público*, supra, pág. 663; *Molini v. Soc. Mario Mercado e Hijos*, supra, pág. 939; *South P. R. Sugar Co. v. Corte*, 62 D.P.R. 841, 843; Novas, supra, pág. 345, escolio 9; García Martínez, supra pág. 390. En verdad, para poder tener derecho a recibir pagos de subsidio bajo las Leyes Azucareras Federales, se ha exigido a las centrales que continúen absorbiendo costos tales como los gastos de arrastre y arrimo que tradicionalmente han asumido. Véanse *Code of Federal Regulations, Title 7—Agriculture, Cumulative Pocket Supplement, 1954, Part 877—Sugar Cane; Puerto Rico* [Added] págs. 683 *et seq.; cf. Bravo v. Tesorero de Puerto Rico*, 76 D.P.R. 154. Es cierto que en el caso específico de Roig en el pasado dicha central no trató la partida de gastos de arrimo en la forma comprendida en el art. 6(c). Pero esto no impide a la Asamblea Legislativa aprobar un estatuto que incluya el art. 6(c) y que, mayormente, reexponga las costumbres y prácticas de la industria azucarera en Puerto Rico. Véase *Secretary of Agriculture v. Central Roig Co.*, supra, págs. 618–9.

 No es función de los tribunales pasar sobre la sabiduría o política de una ley de la Asamblea Legislativa. ". . . [L] a garantía del debido procedimiento . . . sólo exige que la ley no sea irrazonable, arbitraria o caprichosa, y que el medio elegido tenga una relación real y sustancial con el objetivo que se persigue." *Nebbia v. New York*, supra, pág. 525, como ha sido citado en el escolio 7 de esta opinión; *Sunshine Coal Co. v. Adkins*, supra, 394; *People of Puerto Rico v. Eastern Sugar Associates*, supra, pág. 324; escolios 13 y 18 de esta opinión. Por los motivos expuestos (1) en esta opinión, (2) en *Eastern Sugar Associates v. Junta Azucarera*, núm. 2, resuelto en el día de hoy, y (3) en *Eastern Sugar Associates v. Junta Azucarera*, núm. 3, resuelto en el día de hoy, la disposición del art. 6(c) al efecto de que la central suplirá a los colonos vías portátiles sin costo alguno

y les pagará 5 centavos por tonelada de caña como gastos de arrimo, cumple con este requisito. Por consiguiente, no podemos resolver que esta disposición del artículo 6 infringe el debido procedimiento local o federal.

*La resolución de la Junta Azucarera será confirmada con costas y gastos a la peticionaria de acuerdo con el art. 33 de la Ley núm. 426.*

Los Jueces Asociados Sres. Ortiz y Sifre no intervinieron.